CYNTHIA FUTTER (SBN #114096)
ANNE E. WELLS (SBN #155975)
FUTTER-WELLS, PC
2463 Ashland Avenue
Santa Monica, CA 90405
Telephone:  (310) 450-6857
Facsimile:  (888) 900-9077

Attorneys for Chapter 11
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO DIVISION

| | |
|---|---|
| In re<br><br>Carbon Beach Partners, LLC, a Delaware limited liability company,<br><br><br>Debtor and Debtor in Possession. | Bk. No. 1:09-24657-GM<br><br>Chapter 11<br><br>**AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**<br><br>**Disclosure Statement Hearing**<br><br>Date:  June 29, 2010<br>Time:  10:00 AM<br>Place:  Courtroom 303<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367<br><br><br>**Plan Confirmation Hearing**<br>**See Disclosure Statement for**<br>**Voting and Objecting Procedures**<br><br>Date:  [TO BE SET]<br>Time:<br>Ctrm:  Courtroom 303<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367 |

# I.

## INTRODUCTION

Carbon Beach Partners, LLC, a Delaware liability company (the "Debtor") commenced this bankruptcy case by filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101, *et. seq*. (the "Bankruptcy Code") on November 3, 2009 (the "Petition Date").

Chapter 11 allows the Debtor, and in some circumstances, creditors and others parties in interest, to propose a plan of reorganization (the "Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the proponent (the "Proponent") of the Plan sent to you together with this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

Under the Plan, the Debtor will emerge from Chapter 11 as a reorganized entity (the "Reorganized Debtor) and will complete construction of its primary asset, liquidate said asset and distribute the proceeds of said liquidation to creditors in their order of priority. Payments under the Plan will be made from the Reorganized Debtor's cash on hand from post-bankruptcy financing ("Financing Proceeds") and from cash to be generated by the sale of the condominiums which will be completed and liquidated by the Reorganized Debtor.

The Plan will take effect (the "Effective Date") on the first business day of the calendar month following the date that the Court enters the order confirming the Plan (the "Order Entry Date" and the "Confirmation Order," respectively), provided however that the Effective Date must be at least ten (10) days after the Order Entry Date. In the event that the Order Entry Date

is less than ten (10) days before the end of a calendar month, the Effective Date shall be the first business day of the calendar month that begins after the expiration of such ten day period.

**A. Purpose of This Document.**

This Disclosure Statement summarizes the Plan, and provides certain information regarding the Plan and the process that the Court follows in determining whether to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT FOR INFORMATION REGARDING:**

(1)    WHO CAN VOTE ON OR OBJECT TO THE PLAN,

(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)    WHAT THINGS THE COURT WILL CONSIDER IN DETERMING WHETHER TO CONFIRM THE PLAN,

(5)    THE EFFECT OF CONFIRMATION OF THE PLAN, AND

(6)    WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights. You may wish to consult your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires that a Disclosure Statement contain "adequate information" concerning the Plan.  The Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

**B. Deadlines for Voting and Objecting; Date of Plan and Confirmation Hearing.**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT CONFIRMS THE PLAN, THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.    Time and Place of the Confirmation Hearing.**

The hearing at which the Court will consider confirmation of the Plan will be held on *[confirmation hearing date]*, 2010, at _____ a.m, before the Honorable Geraldine Mund, United States Bankruptcy Judge, in Courtroom 303, 20141 Burbank Boulevard, Woodland Hills, California.

**2.    Deadline for Voting on the Plan.**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to counsel for the Debtor at the following address:

CYNTHIA FUTTER (State Bar No. #114096)
FUTTER-WELLS, PC
2463 Ashland Avenue
Santa Monica, California 90405

**Your ballot must be received by 5:00 p.m. PST on *[ballot deadline]* in order to be counted.**

**3.    Deadline for Objection to the Confirmation of the Plan.**

Objections to the confirmation of the Plan, if any, must be filed with the Court and served so that any objections are actually received by counsel to the Debtor by **5:00 p.m. on** *[ballot deadline]*.

> **4.** **Identity of Person to Contact for More Information Regarding the Plan.**

Any interested party desiring further information about the Plan should contact counsel for the Debtor, Cynthia Futter, Futter-Wells, PC, 2463 Ashland Avenue, Santa Monica, California 90405 or by telephone at 310-450-6857.

**C.** **Source of Information and Disclaimer.**

The financial data relied upon in formulating the Plan is based on the Debtor's books and records kept in the ordinary course of business and historical financial statements, and financial statements and projections prepared by the Debtor's professionals with the assistance of the Debtor's management and accounting staff.  The Debtor represents that the information stated in the Disclosure Statement is true and correct to the best of the Debtor's knowledge.  The liquidation analysis, estimates, and other financial information referenced herein, or attached as exhibits hereto, have been developed by the Debtor with the assistance of its professional advisors.  Although these professional advisors assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Debtor's management, which information has not been audited.  No statements of information concerning the Debtor or its assets are authorized, other than as set forth herein.

> **II.**
>
> **BACKGROUND**

## A. Description and History of the Debtor's Business.

The Debtor owns land and the improvements thereon, consisting of an 8 unit, luxury condominium complex consisting of approximately 41,000 square feet, in Malibu, California (the "Property"). The Debtor acquired the Property in 2003 for the sum of $3,825,000.  In order to develop the Property, the Debtor borrowed development funds from Builders Bank (the "Bank"). The Debtor gave the Bank a promissory note for said funds and provided to the Bank a mortgage on the Property to secure the repayment of the Bank note.  Due to a series of entitlement and other City of Malibu delays in permitting the building of the project, the term and amount of the  Bank debt was extended several times.

By the end of 2008, the Property was approximately 95% completed.  However, the Debtor and the Bank were unable to come to terms on a restructuring of the Bank debt.  The Bank sued the Debtor and sought the appointment of a receiver (the "Receiver") to complete construction of the Property so that it could be sold and the Bank paid off.  The Bank and the Debtor reached an agreement as to the disposition of proceeds upon the sale of the Property once completed by the Receiver.  In the meantime, a number of subcontractors and the general contractor filed a series of mechanic's liens against the Property, and a series of lawsuits were then filed contesting both the validity and priority of these mechanics' liens vis-à-vis the liens of the Bank.

Unfortunately, the Receiver that was appointed was unable to complete construction of the Property and more than a year passed while the Receiver floundered.  In the meantime, the Receiver was signing contracts and incurring debt, most of which did not seem to move the Property toward completion.  Finally, in late 2009, the Bank informed the Receiver that it was no longer willing or able to fund the receivership and the Receiver and the Bank ended up in a dispute over certain of the expenses incurred by the Receiver.

When the Receiver allowed critical insurance to lapse, the Debtor filed this case.

**B.  Principals/Affiliates of Debtor's Business.**

The Debtor is a Delaware limited liability company.  The members of the Debtor as of the Petition Date were Villa Development and SCKG Company, LLC ("SCKG").  The manager of the Debtor is Jordinia Operations, LLC, an affiliate of SCKG.

**C.  Management of the Debtor Before and After the Bankruptcy.**

The Debtor is managed by a manager, Jordinia Operations, Inc., both prior to and after the Petition Date.   It will continue to serve in that capacity following the Effective Date of the Plan.

**D.  Events Leading to Chapter 11 Filing.**

The events leading to the filing of this case are described above in detail.

**E.  Significant Events During the Bankruptcy Case.**

**1.      Bankruptcy Proceedings.**

Following the Petition Date, the Debtor timely filed its 7-Day Package with the Office of the United States Trustee (the "OUST") and its Schedules of Assets and Liabilities and Statement of Financial Affairs with the Court.  The Debtor attended its Initial Debtor Interview with the OUST and the meeting of creditors required by Bankruptcy Code §341(a).  The Debtor has continued to prepare and lodge its monthly operating reports and interim statements in a timely manner.  The Debtor also sought and obtained Bankruptcy Court approval to retain the law firm of Futter-Wells, PC as its bankruptcy counsel.

In January 2010, the Bank filed a motion to have this case deemed a single asset real estate case.  This was unopposed by the Debtor and an order to that effect was entered by the Court on February 16, 2010.  In addition, previous state court counsel for the Debtor filed a

motion for relief from stay in order to withdraw in certain pre-bankruptcy mechanics' lien litigation.  This motion was unopposed by the Debtor and the Court has entered an order to that effect.  Finally, the Receiver filed a motion for relief from the automatic stay to file a final account in the state court action in which the Receiver was appointed.  A stipulated order was agreed upon by the Debtor and the Receiver, and it was entered by the Court.

There have been three status conferences in this case.  Pursuant to court order, a bar date of April 27, 2010 was been set by the Court for all creditors to file claims against the Debtor. The following summarizes the claims filed against the Debtor.

| Secured Claims | Amount |
| --- | --- |
| Cell-Crete Corp. | $20,761 |
| Signature Interiors | $237,284.39 |
| DRI Commercial Corporation | $10,758 |
| All Pro Framing, Inc. | $44,333.39 |
| TJS Enterprises, Inc. | $25,404.35 |
| JYG Concrete | $57,224.56 |
| Builders Bank | $17,876,900.16 |
| First Insurance Funding Corporation | $185,947.48 |
| Los Angeles County Tax Collector | $66,745.10 |
| **Unsecured Claims** | **Amount** |
| Franchise Tax Board | $1,890.28 |
| Kachay Co. | $75,000 |
| Landscape Construction Solutions | $165,125.34 |

## 2.    Other Legal Proceedings.

### a.  Litigation Against the Bank and the Pre-Bankruptcy Receiver.

As indicated above, for more than a year prior to the bankruptcy, the Property was under the control of the Bank and a state court receiver, who was put in place in order to complete the Property more than a year before this chapter 11 was filed.   Pursuant to a joint venture/partnership arrangement between the Bank and the Debtor and its principals, in October 2008, the Receiver was appointed to complete construction of the Property, which was then approximately 95% complete.   The Bank was to fund the money necessary to complete the construction of the condominiums at the Property and to resolve and pay certain mechanics' liens claims that were filed against the Property.   After payment of its secured debt, the Bank and the Debtor and its principals were to split the proceeds of sale of the Property 50/50.   This agreement was confirmed by the parties, and both the Bank and the Debtor took steps to implement this agreed upon resolution of the Bank claim and the completion of the Property.

In addition to dealing with completion of the Property construction, the mechanics liens and the amount and priority of their claims needed to be resolved, as part of the joint venture/partnership between the Debtor and the Bank, the Bank agreed to negotiate and fund settlements with these claimants and pay the legal fees in litigation in which these claimants and the Debtor and Bank were involved.   The owners of the Debtor agreed to pay for counsel for the myriad of litigation that was pending between unpaid trade creditors who did not assert liens against the Property and the Debtor.

Once the agreed upon receiver was appointed, several receiver's certificates were approved, but the Bank and the professionals it chose did not complete the construction of the Property.   In fact, according to information available to the Debtor, the Bank and its professionals, or those hired through the auspices of the receiver but supervised by the Bank, started demolishing part of the Property, by, for instance, ripping out cabinets and other activities.   Massive structural and design changes were made to the original plans and the Bank and the Receiver sought regulatory approval for these changes.   The Bank continued to promise the Debtor and the Debtor's principals that plans, a budget and other documentation about the completion of construction of the Property was in process and would be forthcoming.

To the Debtor's knowledge, the joint venture/partnership was on track until mid-2009. The Bank provided the Debtor and its principals with marketing analysis establishing that the Property was worth approximately $20 million AS IS. Given the status of the economy and real estate in general, no certain value could be ascertained, but all parties were optimistic that the Property would be completed and the Property sold for a profit that the Bank and the Debtor and its principals would share 50/50. In addition, in September 2009, the Bank finally provided to the Debtor its budget for completion of construction at the Property and the steps it intended to take to get the Property completed and sold and creditors paid.

Throughout 2009, and into September 2009, just a couple of months before this chapter 11 was filed, the president of the Bank was still promising or providing the Debtor and its principals budgets, construction plans and other data relevant to the completion of the Property. However, it is now clear from pleadings filed by the Receiver, in September 2009, after a large amount of trade and construction debt had been incurred by the receiver to a new general contractor, other contractors and professionals, insurance providers and utility companies, the Bank informed the Receiver, but not the Debtor or its principals, that it no longer had the financial capacity to fund the completion of the condominiums, or any of the operating or maintenance expenses related thereto. This debt is estimated to be in the range of $500,000 to $750,000 (the "Unpaid Receivership Debts"). In addition, the Bank became disenchanted with the general contractor it had chosen to complete the construction, and there were other disputes between the Receiver and the Bank.

As a result of the cessation of funding for the Property and the cessation of any work at the Property, there are a number of issues that the Debtor must now deal with including, but not limited to, plans that have been substantially modified but not approved by the City of Malibu, incomplete construction, including holes in walls, partially demolished units, exposed electrical wires and structural steel, and mis-matched construction, landscaping and design resulting from the Bank and the Receiver attempting to redesign, rather than complete, construction of the Property.

Prior to the chapter 11, the Bank, in order to achieve the stipulated appointment of the Receiver, filed a judicial foreclosure action against the Debtor. This action has been stayed since this bankruptcy case was filed. In order to address its issues with the Bank, the Debtor removed this action to the Bankruptcy Court in April 2010.

In addition, the Bank has filed a claim in excess of $17 million against the Debtor, and this includes monies related to the Receiver and the activities at the Property during the time the Receiver and the Bank were in control of the Property. In response to this claim, and to prevent the Bank and the Receiver from simply abandoning the situation they created at the Property, the Debtor has filed a counterclaim against the Bank contesting the Bank's claim. It has also filed claims against the Receiver and the Bank seeking damages for the activities of the Bank and the Receiver at the Property and damages for the Bank inducing the Debtor to turnover control of the Property to it on the promise that the Bank could and would finance and complete construction of the Property, resolve and pay mechanics' claims, and split the profits from the sale of the Property with the Debtor. In addition, the Debtor seeks indemnification from the Receiver and the Bank for the Unpaid Receivership Debts to reimburse the Debtor for any amounts the Debtor is required to pay said debt holders and the Debtor's legal fees in dealing with the Unpaid Receivership Debt.

The Bank disputes the Debtor's contentions. A status conference is set for June 2010 in this action. A copy of the action against the Bank and the Receiver can be obtained by request from counsel to the Debtor.

**b. Other Claims Objections.**

In addition to the claim of the Bank, the Debtor will be objecting to the claims filed by holders of the Unpaid Receivership Debt, including, but not limited to, those of: (i) Kachay Co., Inc., the general contractor hired by the Bank and the Receiver, in the amounts of $75,000 and another under the name of Landscape Construction Solutions in the amount of $265,125.34; and (ii) First Insurance Funding Corp., the insurance financing agency hired by the Bank and the

Receiver for unpaid premiums on policies taken out by the Receiver.  First Insurance Funding Corp. has filed a claim for $185,947.48 asserting that it is secured as well.  These objections will be filed no later than August 15, 2010.

### c.         The Mechanics' Lien Claim Holders.

As indicated above, a number of mechanics liens were filed against the Property, both pre- and post-bankruptcy.  Many of these relate to services incurred by the Debtor before the Receiver and Bank took control of the Property, but the Debtor is informed that at least one of them relates to Unpaid Receivership Debt and was filed after this bankruptcy case was filed.  To the extent the holder of this claim will not release it voluntarily, the Debtor will bring an action pursuant to Bankruptcy Code §549 to invalidate said lien. In addition, the Debtor anticipates filing an adversary proceeding against holders of the mechanics' liens to determine the extent, validity and priority of said claims vis-à-vis the Debtor and vis-à-vis the Bank.  The Debtor believes that most of these claims will be determined to be unsecured claims.  However, the majority of these claim holders failed to file proofs of claim by the court ordered bar date, and the Debtor will seek the disallowance of any such claim if the holder failed to file a claim by the bar date.

### d.  Other Litigation Claims.

The Debtor will investigate all other claims and causes of action that may be asserted for the benefit of the estate.  All of the Debtor's rights and interests to assert and pursue such claims and causes of action following the Effective Date of the Plan shall be vested in and held by the Reorganized Debtor, and are expressly reserved in the Plan.  All legal fees and expenses to be incurred by the Debtor in bringing said actions will be funded by the manager of the Debtor, with

said fees and expenses to be subject to court approval and subject to reimbursement of the manager for said fees as an administrative expense of this estate.

### 3. Actual and Projected Recovery of Preferential or Fraudulent Transfers.

Some payments made by the Debtor may be construed to be avoidable transfers and subject transferees to liability or to claim disallowance in accordance with the terms of the Bankruptcy Code §§547 and 548, including any payment that was made by the Debtor within ninety (90) days prior to the Petition Date, or one year prior to the Petition Date for an insider.

The Debtor will continue to investigate potential claims under Bankruptcy Code §§547 and 548. Upon completion of such investigation and analysis, the Debtor will commence, where appropriate, actions for avoidance and recovery of preferential and fraudulent transfers. At this time, the Debtor does not anticipate that recovery in preference actions will constitute a significant source of recovery for the Debtor and its estate. All of the Debtor's rights and interests to assert and pursue such claims and causes of action following the Effective Date of the Plan shall be vested in and held by the Reorganized Debtor, and are expressly reserved in the Plan. However, since the Receiver was in possession of the Property of the Debtor for more than a year prior to the Petition Date and the Debtor made no payments to creditors, the Debtor does not believe that any avoidance actions exist.

### F. Operations During the Chapter 11 Case.

As of the Petition Date, the Debtor's corporate offices were located at 5150 Overland Avenue, Culver City, California 91230. The Debtor does not pay rent for the use of these premises, which are also the business premises of the manager of the Debtor.

Since the Petition Date, the manager of the Debtor has paid the insurance due on the Property and paid certain limited expenses relating to the Property, including security and other

minimal necessary preservation expenses.  There have been no other operations at the Property in the chapter 11 case; there is, however, a representative of the Debtor at the Property during normal business hours.

## SUMMARY OF THE PLAN OF REORGANIZATION

**A.  What Creditors and Interest Holders Will Receive Under the Proposed Plan.**

The Plan classifies claims and interests in various classes according to their right to priority of payments under the Bankruptcy Code.  The Plan provides for the treatment of each class under the Plan and also states whether each class of claims or interests is impaired or unimpaired.

B.  **Unclassified Claims.**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the following claims are not placed in a class.  The treatment of these claims is provided below.

1.      **Administrative Expenses.**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case that are allowed under Bankruptcy Code §507(a) (1).  The Bankruptcy Code requires that all such administrative claims be paid on the Effective Date unless the holder of such claim agrees to a different treatment from Financing Proceeds.

The following chart lists all administrative claims under Bankruptcy Code §507(a) (1) (after application of retainers) and their treatment under the Plan.  The Court must approve all professional fees listed other than Clerk's Office fees and U.S. Trustee's fees.  Professionals must file and serve a properly noticed fee application for approval by the Bankruptcy Court

within sixty (60) days of the Effective Date.  Only fees actually allowed by the Court are

required to be paid by the Reorganized Debtor under the Plan.

|  | **Estimated** | **Treatment** |
|---|---|---|
| Futter-Wells, PC. (Debtor's Bankruptcy) Counsel) | $75,000 [estimated] | Upon Court approval paid in full or as agreed upon by Futter-Wells, PC |
| Clerk's Office Fees | N/A | Paid in full on Effective Date or on an ongoing basis |
| Office of the U.S. Trustee Fees | $650. | Paid in full on Effective Date or on an ongoing basis |
| Expenses Incurred by the Manager of the Debtor during the Chapter 11 for insurance, taxes and security | $14,350 | Upon Court approval, paid in full on Effective Date or on an ongoing basis |
| TOTAL (ESTIMATED) | $100,000 | |

> **2.** **Priority Tax Claims.**

Priority tax claims are certain unsecured income, employment and other taxes described

by Bankruptcy Code §507(a) (8).  The Bankruptcy Code requires that each holder of a Priority

Tax Claim receive the present value of such claim in deferred cash payments, over a period not

exceeding six years from the date of the assessment of such tax.  The California Franchise Tax

Board has filed a claim against the Debtor in the sum of $1890.20, but the Debtor does not

believe this is accurate given the tax accounting provided by the Receiver.   The Debtor believes

the Receiver did not accurately categorize and capitalize the expenses related to the Property and

that the Debtor does not in fact owe these 2009 taxes.  To the extent that it is determined that the

Debtor has any such claims, they will be paid in full on the Effective Date from Financing

Proceeds.

**C.**    **Classified Claims and Interests.**

> **1.**    **Classes of Secured Claims.**

Secured claims are claims secured by liens on property of the Debtor's estate. The following is a list and classification of creditors holding secured claims and the proposed treatment of such claims under the Plan. Because the extent and priority of these secured claims is disputed, the listing of said claims in any particular order is not an admission or statement as to their actual priority of payment. The Debtor believes that most of the Class 1B to P claims will be determined to be Class 3 claims, but that most of them will be disallowed because of the failure of the claim holder to file a claim by the court ordered bar date. The new loan documentation to be provided to the Class 1 claim holders, with the exception of the Class 1A claim, is discussed below.

### a. Class 1A: Claim of County of Los Angeles.

Class 1A consists of the claim of the County of Los Angeles for any unpaid property taxes on the Property. The Debtor believes that this claim has the first right of payment from any sales proceeds. This claim, once allowed, will be paid in full on the Effective Date. The Debtor believes this claim to be approximately $66,745.10, representing the unpaid property taxes due in December 2009 and based on the proof of claim filed by the Class 1A claim holder. Any interest and penalties included in the allowed Class 1A claim will be paid in full on the Effective Date.

### b. Class 1B: All Pro Framing Secured Claim.

Class 1B consists of the secured claim asserted by All Pro Framing pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1B claimant to the Debtor. The Class 1B claimant asserts a claim in the approximate amount of $44,333.39. The amount of the Class 1B Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1B Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1B Secured Claim"). To the extent that any or all of the Class 1B Secured Claim is determined to be unsecured, the portion deemed unsecured will be treated as a general unsecured claim in Class 3. The Class 1B Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1B Secured Claim after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Class 1B Secured Claim will accrue interest at the rate of 5% per annum. The holder of the Class 1B Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1B Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1B Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**c. Class 1C: Wall Design Incorporated Secured Claim.**

Class 1C consists of the secured claim asserted by Wall Design Incorporated pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1C claimant to the Debtor. Pre-bankruptcy, the Class 1C claimant asserted a claim in the approximate amount of $352,280, but did not file a proof of claim against the Debtor. The amount of the Class 1C Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1C Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1C Secured

Claim"). To the extent that any or all of the Class 1C Secured Claim is determined to be unsecured the Debtor will ask the Court to disallow the Class 1C claim for failure to file a proof of claim. The Class 1C Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1C Secured Claim after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Class 1C Secured Claim will accrue interest at the rate of 5% per annum. The holder of the Class 1C Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1C Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1C Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**d.  Class 1D: Signature Interiors, Inc. Secured Claim.**

Class 1D consists of the secured claim asserted by Signature Interiors, Inc. pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1D claimant to the Debtor. The Class 1D claimant asserted a claim in the approximate amount of $216,576 pre-bankruptcy, but filed a proof of claim in the amount of $237,284.39. The amount of the Class 1D Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1D Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1D Secured Claim"). To the extent that any or all of the Class 1D Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1D claim for failure to file a proof of claim. The Class 1D Secured Claim shall be paid as follows upon determination of the

amount actually due to the holder of the Class 1D Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1D Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1D Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1D Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1D Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**e.  Class 1E: Southcoast Cabinet Secured Claim.**

Class 1E consists of the secured claim asserted by Southcoast Cabinet pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1E claimant to the Debtor.  The Class 1E claimant asserted a claim in the approximate amount of $132,384, but failed to file a proof of claim against the Debtor.  The amount of the Class 1E Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1E Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1E Secured Claim").  To the extent that any or all of the Class 1E Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1E claim for failure to file a proof of claim.   The Class 1E Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1E Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1E Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1E Secured Claim will be

paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by

the Reorganized Debtor.  The holder of the Class 1E Claim will maintain its lien on the Property

and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date,

subject to subordination to the extent of the Financing Proceeds.

The Class 1E Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**f.  Class 1F: Cell-Crete Corp. Secured Claim.**

Class 1F consists of the secured claim asserted by Cell-Crete Corp. pursuant to a

mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services

allegedly rendered by the Class 1F claimant to the Debtor.  The Class 1F claimant filed a claim

against the Debtor in the approximate amount of $20,761.  The amount of the Class 1F Secured

Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1F Secured

Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court,

but in no event, to exceed the value of the collateral securing its claim (the "Class 1F Secured

Claim").  To the extent that any or all of the Class 1F Secured Claim is determined to be

unsecured, the portion deemed unsecured will be treated as a general unsecured claim in Class 3.

The Class 1F Secured Claim shall be paid as follows upon determination of the amount actually

due to the holder of the Class 1F Secured Claim after any offsets or damages to which the Debtor

is entitled.  From and after the Effective Date, the Class 1F Secured Claim will accrue interest at

the rate of 5% per annum.  The holder of the Class 1F Secured Claim will be paid the amount of

allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized

Debtor.  The holder of the Class 1F Claim will maintain its lien on the Property and any proceeds

therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1F Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**g.  Class 1G: Dynamic Plumbing Secured Claim.**

Class 1G consists of the secured claim asserted by Dynamic Plumbing pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1G claimant to the Debtor.  The Class 1G claimant asserted a pre-bankruptcy claim against the Debtor in the approximate amount of $118,559, but failed to file a proof of claim against the Debtor.  The amount of the Class 1H Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1G Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1G Secured Claim").  To the extent that any or all of the Class 1G Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1G claim for failure to file a proof of claim.  The Class 1G Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1G Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1G Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1G Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1G Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1G Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**h.  Class 1H: IZ Construction Secured Claim.**

Class 1H consists of the secured claim asserted by IZ Construction pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1H claimant to the Debtor.  The Class 1H claimant asserted a pre-bankruptcy claim in the approximate amount of $249,843, but failed to file a proof of claim against the Debtor.  The amount of the Class 1H Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1H Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1H Secured Claim").  To the extent that any or all of the Class 1H Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1H claim for failure to file a proof of claim.   The Class 1H Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1H Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1H Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1H Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1H Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1H Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**i.  Class 1I: JYG Concrete Secured Claim.**

Class 1I consists of the secured claim asserted by JYG Concrete pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1I claimant to the Debtor. The Class 1I claimant filed a claim against the Debtor in the amount of $57,224. The amount of the Class 1I Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1I Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1I Secured Claim"). To the extent that any or all of the Class 1I Secured Claim is determined to be unsecured, the portion deemed unsecured will be treated as a general unsecured claim in Class 3. The Class 1I Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1I Secured Claim after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Class 1I Secured Claim will accrue interest at the rate of 5% per annum. The holder of the Class 1I Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1I Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1I Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**j.  Class 1J: Karcher Interior Systems Secured Claim.**

Class 1J consists of the secured claim asserted by Karcher Interior Systems to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1J claimant to the Debtor. The Class 1J claimant asserted a

claim in the approximate amount of $2,025 pre-bankruptcy, but failed to file a proof of claim against the Debtor.  The amount of the Class 1J Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1J Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1J Secured Claim").  To the extent that any or all of the Class 1J Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1J claim for failure to file a proof of claim.  The Class 1J Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1J Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1J Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1J Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1J Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1J Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**k.  Class 1K: M Maintenance Secured Claim.**

Class 1K consists of the secured claim asserted by M Maintenance pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1K claimant to the Debtor.  The Class 1K claimant asserted a claim in the approximate amount of $10,395 pre-bankruptcy, but failed to file a proof of claim against the Debtor.  The amount of the Class 1K Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1K Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1K Secured Claim"). To the extent that any or the entire Class 1K Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1K claim for failure to file a proof of claim. The Class 1K Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1K Secured Claim after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Class 1K Secured Claim will accrue interest at the rate of 5% per annum. The holder of the Class 1K Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1K Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1K Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**l.   Class 1L: Tazz Lighting Secured Claim.**

Class 1L consists of the secured claim asserted by Tazz Lighting pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1L claimant to the Debtor. The Class 1L claimant asserted a claim in the approximate amount of $26,295 pre-bankruptcy, but failed to file a proof of claim against the Debtor. The amount of the Class 1L Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1L Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1L Secured

Claim"). To the extent that any or all of the Class 1L Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1L claim for failure to file a proof of claim. The Class 1L Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1L Secured Claim after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Class 1L Secured Claim will accrue interest at the rate of 5% per annum. The holder of the Class 1L Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1L Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1L Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**m. Class 1M: C&S Pipeline Secured Claim.**

Class 1M consists of the secured claim asserted by C&S Pipeline pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1M claimant to the Debtor. The Class 1M claimant asserted a claim in the approximate amount of $61,829 re-bankruptcy, but failed to file a proof of claim against the Debtor. The amount of the Class 1M Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1M Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1M Secured Claim"). To the extent that any or all of the Class 1M Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1M claim for failure to file a proof of claim. The Class 1M Secured Claim shall be paid as follows upon determination of the

amount actually due to the holder of the Class 1M Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1M Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1M Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1M Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1M Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**n.  Class 1N: JA Hill Corporation Secured Claim.**

Class 1N consists of the secured claim asserted by JA Hill Corporation pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1N claimant to the Debtor.  The Class 1N claimant asserted a claim in the approximate amount of $1,436,698 pre-bankruptcy, but failed to file a proof of claim against the Debtor.  The amount of the Class 1N Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1N Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1N Secured Claim").  To the extent that any or all of the Class 1N Secured Claim is determined to be unsecured, the Debtor will ask the Court to disallow the Class 1N claim for failure to file a proof of claim.  The Class 1N Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1N Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1N Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1N Secured Claim will be

paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor. The holder of the Class 1N Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1N Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**o. Class 1O: Builders Bank Secured Claim.**

Class 1O consists of the secured claim asserted by the Bank pursuant to a series of notes and a mortgage on the Debtor's property to secure the repayment of said notes. The Bank asserts a principal claim in the approximate amount of $13,500,000 (after offsets and other reductions to be determined as part of the claims allowance process), and has filed a claim seeking more than $17 million. The filed claim seeks late fees, default interest, legal fees and expenses related to the Receiver. The amount of the Bank Secured Claim is subject to dispute in the adversary proceeding against the Bank and the Receiver discussed above.

In accordance with Bankruptcy Code §506(a) (1), the Bank shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Bank Secured Claim"). To the extent that any or all of the Bank Secured Claim is determined to be unsecured, the portion deemed unsecured will be treated as a general unsecured claim in Class 3. The Bank Secured Claim shall be paid as follows upon determination of the amount actually due to the Bank and after any offsets or damages to which the Debtor is entitled. From and after the Effective Date, the Bank will receive monthly interest payments of 6% per annum on any outstanding allowed claim. The Bank will be paid the remainder of any allowed secured claim from the proceeds of the sale of the Property by the Reorganized Debtor. The Bank will maintain its lien on the Property and any

proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1O Builders Bank Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**p.  Class 1P: DRI Commercial Corporation Secured Claim.**

Class 1P consists of the secured claim asserted by DRI Commercial Corporation pursuant to a mechanics' lien allegedly filed on the Debtor's property to secure the payment for certain services allegedly rendered by the Class 1P claimant to the Debtor.  The Class 1P claimant filed a proof of claim against the Debtor in the amount of $10,758.  The Class 1P Secured Claim is subject to dispute.

In accordance with Bankruptcy Code §506(a)(1), the holder of the Class 1P Secured Claim shall have an allowed secured claimed in the amount determined by the Bankruptcy Court, but in no event, to exceed the value of the collateral securing its claim (the "Class 1P Secured Claim").  To the extent that any or all of the Class 1P Secured Claim is determined to be unsecured, the portion deemed unsecured will be treated as a general unsecured claim in Class 3.  The Class 1P Secured Claim shall be paid as follows upon determination of the amount actually due to the holder of the Class 1P Secured Claim after any offsets or damages to which the Debtor is entitled.  From and after the Effective Date, the Class 1P Secured Claim will accrue interest at the rate of 5% per annum.  The holder of the Class 1P Secured Claim will be paid the amount of allowed secured claim from the proceeds of the liquidation of the Property by the Reorganized Debtor.  The holder of the Class 1P Claim will maintain its lien on the Property and any proceeds therefrom to the extent and in the priority it existed as of the Petition Date, subject to subordination to the extent of the Financing Proceeds.

The Class 1P Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**2. Class 2: Priority Unsecured Claims.**

Certain priority claims arising under Bankruptcy Code §§507(a) (1), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim unless such priority claim holders elect to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor does not believe that there are any Priority Unsecured Claims. However, any holder of a Class 2 Priority Unsecured Claims will be paid in full in four quarterly installments beginning at the conclusion of the first full quarter after the Effective Date. Such claims shall earn interest at 5% until paid in full.

Class 2 Priority Unsecured Claims, if any, are impaired and entitled to vote to accept or reject the Plan. If Class 2 rejects the foregoing treatment, the Class 2 Claim will be paid in cash in full on the Effective Date.

**3. Classes of Unsecured Claims.**

Class 3 consists of all unsecured claims against the Debtor that are not tax claims or Class 4 Equity Interests. The Debtor estimates that there is approximately $75,000 of claims in Class 3 (prior to inclusion of any Class1 claims that are determined to be allowed unsecured claims).[1] The one claim believed to be in Class 3 properly did not file a proof of claim against the Debtor.

---

[1]  While a number of claims have been filed or asserted by the Receiver or persons or entities contracting with the Receiver, these are not claims that the Debtor believes are properly asserted against the Debtor, who did not retain them nor have any contractual relationship with them. For instance, the general contractor for the Receiver has filed a claim against the Debtor for services rendered to the Receiver pursuant to an alleged agreement with the Receiver. In fact, the Debtor never agreed to hire this contractor, nor was it ever obligated to pay for any such services. All Receivership claims for services not paid for by the Receiver will be objected to by the Debtor.

The Plan proposes to pay Class 3 General Unsecured Claims their pro rata share of any liquidation proceeds based upon the amount of an allowed claim after payment of all other creditor claims as said proceeds become available.  Holders of Class 3 General Unsecured Claims will receive their *pro rata* share of quarterly payments (the "Plan Payments") based upon the Reorganized Debtor's actual sales and revenue.  Holders of Class 3 General Unsecured Claims will receive no interest on their claims.  The exact amount of payments to the Class 3 claim holders cannot be determined until the net sales proceeds and the allowed amount of all the Class 1 claims is determined.  There will be no minimum quarterly payments made to said Class 3 claim holders, but they will receive, on a quarterly basis, commencing when there is at least $50,000 to be distributed to Class 3 claimants, their *pro rata* share of any funds to be distributed to Class 3 claim holders.  A creditor's *pro rata* share will be calculated by dividing the allowed amount of said creditor's claim by the full amount of all allowed Class 3 claims.

Holders of Class 3 General Unsecured Claims are impaired and entitled to vote to accept or reject the Plan.

4**.        Class 4 Interest Holders.**

The Plan leaves unaltered the legal, equitable, and contractual rights of the holders of equity interests in the Debtor.  All holders of equity interests in the Debtor shall retain their interests in the Reorganized Debtor.  There shall be no distributions to holders of equity interests in the Reorganized Debtor until such time as all other allowed Class 1, Class 2 and Class 3 claims have been paid in full as provided for herein.

Holders of Claims in Class 4 are unimpaired and deemed to accept the Plan.

**D.        Means of Performing the Plan.**

**1. Funding for the Plan.**

The Plan will be funded by a loan from a new lender and from the proceeds of sale of the Reorganized Debtor's assets upon completion.  Upon the Effective Date, a new lender will make a loan to the Debtor in the amount of approximately $2.7 million (the "Finishing Loan").  The Reorganized Debtor will pay loan points of 3% to the new lender, Active Mortgage Corp. (the "New Lender"), and this loan will bear interest at 12% interest per annum, with the balance due and payable on the 18 month anniversary of the Effective Date.  Active Mortgage Corp. is a lender with a California Finance Lender's license.  It is in good standing in California and is owned in part by certain relatives of the President of the Manager of the Debtor.  The repayment of the Finishing Loan will be secured by a first priority deed of trust on all the assets of the Reorganized Debtor from and after the Effective Date.  The terms of the Finishing Loan are similar to the loans that the Receiver tried to put in place on the Property when the Bank failed to fund the Receiver and the completion of the Property.[2]

The Debtor will be filing a "priming loan" motion in connection with confirmation of the Plan and the Finishing Loan.  The Financing Proceeds will include an interest reserve for the term of the loan.  As indicated, part of the Financing Proceeds will be used to pay any allowed Administrative Claims, to make payments on the Bank Secured Claim, and to finish the construction of the Debtor's condominium complex.   The specific uses of the Financing Proceeds by category and date are outlined in Exhibit A to the Disclosure Statement accompanying this Plan.  The anticipated costs of completion for the Property, by category and time frame, are also attached as Exhibit A hereto.

---

[2]   The Finishing Loan will have customary terms and conditions, including covenants, representations, events of default, rights upon default, and other standard loan provisions.  Active Mortgage Corp. is only prepared to make the Finishing Loan if the Bankruptcy Court approves the priming loan application to be filed by the Debtor in conjunction with confirmation of the Plan and, unless Active Mortgage consents otherwise, if the contracts with the general contractor and marketing/brokerage firm are approved by the Court in conjunction with confirmation.

In connection with confirmation of the plan and claims objections, the Debtor will be asking the Court to value the Property for purposes of determining the amount and extent of secured claims under Bankruptcy Code §506.  The Debtor will also be filing a motion for authority to enter into the Finishing Loan and to place senior financing on the Property for purposes of funding the Plan and finishing construction of the Property.  All creditors will be noticed of both hearings and motions.

**2.    Post-confirmation Management.**

**a.    Management of the Debtor.**

Jordinia Operations, Inc. will continue to serve as the manager of the Reorganized Debtor.    Jordinia Operations, Inc. will be paid a monthly fee of $10,000 from the Financing Proceeds for this purpose.

**b.    Completion of Construction of the Property.**

The Debtor will need an experienced general contractor to complete construction of the Property and to assess and fix the damage done during the time the Receiver and the Bank were in control of the Property.  The Debtor has asked a number of advisors to survey the Property, to determine what regulatory or other approvals were commenced but not completed by the Receiver and the Bank, and to advise the Debtor as to the steps that must be completed to finish construction of the Property.   From and after the time the Bank stopped funding the completion of construction and the Receiver, the Debtor believes the following, among other things, still need to be completed:   flatwork, deck waterproofing and concrete over-pour, landscaping, completion of plumbing fixtures, completion of  underground utilities; completion of railings, final hook-up of elevators and  HVAC systems, and  miscellaneous smaller items.

In order to assure the timely and professional completion of the Project, the Debtor is in the process of interviewing general contractors.  The Debtor has identified at least one contractor that is acceptable to the Debtor and with which the manager of the Debtor has extensive experience.  Information on said contractor, including experience, qualifications, representative clients, licensing and biographies, is attached hereto as Exhibit B.  This proposed contractor has

significant experience in multi-family or hospitality properties of the caliber and quality of the Property.  The Debtor has not completed its interviews, but at least 30 days prior to confirmation, the Debtor will notify all creditors if it chooses to use a different general contractor and will provide the name and qualifications of said general contractor.  No less than 30 days prior to the hearing on confirmation of the plan, the Debtor will file the final general contractor documents, including the contract, to be reviewed by creditors and approved by the Bankruptcy Court as part of the confirmation process.

The Debtor believes that it will take approximately 15 months after the Effective Date to complete and sale the individual condominium units at the Property.  The completion of construction is estimated to be achieved approximately 5 months after the Effective Date.

**3.    Disbursing Agent.**

The Reorganized Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan.  The Disbursing Agent shall serve without bond and shall receive reasonable compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**4.    Loan Documentation for Allowed Class 1 Claims (Exclusive of Class 1A).**

Each holder of an allowed Class 1 secured claim, other than the holder of the Class 1A claim which will be paid in full on the Effective Date, will receive a note and a deed of trust in the amount and priority of their claim as allowed by the Bankruptcy Court.  The holders of the Class 1B to 1P (exclusive of the Class 1O claim) claims did not have pre-bankruptcy loan documents. The Bank, the holder of the Class 1O claim, did have pre-bankruptcy loan documentation; however, most of it is inapplicable to the Debtor emerging from chapter 11.  Specifically, the Bank's pre-bankruptcy loan documentation contained numerous definitions, advance requirements, reporting requirements, environmental, title, litigation and other report

requirements, reserve requirements, indemnification provisions, covenants, representations and other provisions that no longer apply or are no longer true for the Debtor.

The note and deed of trust to be provided to each holder of an allowed Class 1 claim, other than the holder of the Class 1A claim, will be filed with the Court and served on the holders of allowed Class 1 claims, at least 30 days prior to the hearing on confirmation of the Plan, to be reviewed by the Class 1 claim holders and approved by the Court in conjunction with confirmation of the Plan.  These documents will include, in addition to the term, interest rate , default and other standard provisions, covenants requiring insurance, payment of taxes, prohibitions against transfer (other than as discussed below) or further encumbrances, use of the Financing Proceeds, distribution of financials, and approval of material contracts (other than those approved in connection with confirmation).   The obligations of each Class 1 allowed claim holder will be cross-defaulted with all other Class 1 claim holders.

5. **Default under Plan Payments.**

In the event of a default by the Debtor pursuant to the loan documentation provided by the Debtor, the loan documentation provided to each of the Class 1 claim holders will provide that, in the event of a default, each such creditor is free to exercise its state law remedies without further order or relief from the Bankruptcy Court.

6. **Marketing and Sales of Condominium Units.**

a. **Marketing of the Property for Sale.**

The Debtor intends to retain a well-known marketing/brokerage agency, ISG Realty, for the sale of the condominium units once completed.   Information regarding this broker/marketing firm, and their general approach, is attached hereto as Exhibit C.  While the Debtor has received a draft engagement agreement for this firm, it has not agreed to such contract.  The Debtor will

file the final, agreed upon contract no less than 30 days prior to the confirmation hearing and ask the Court to approve said agreement in connection with confirmation of the Plan (the "ISG Realty Agreement").

As to the price for which the units will be marketed and listed for sale, it is anticipated, and the projections provide, for a 15 month completion period following the Effective Date. According to a valuation analysis provided by the Bank to the Debtor as part of the joint venture/partnership relationship between the Bank and the Debtor, the Property, once the units are completed, will have a value of approximately $23,380,000. In connection with the application for the loan to finish the construction, discussed above, the Property will be valued in both its AS-IS and completed state.

The Pritchett-Rapt analysis, provided by the Bank to the Debtor as part of the joint venture/partnership relationship in August 2009, suggested the following list prices for the units:

| Unit Number | Listing Price |
|---|---|
| 1 | $2,995,000 |
| 2 | $2,850,000 |
| 3 | $2,850,000 |
| 4 | $2,995,000 |
| 5 | $2,995,000 |
| 6 | $2,850,000 |
| 7 | $2,850,000 |
| 8 | $2,995,000 |
| **Total** | $23,380,000 |

These amounts will be finalized in connection with confirmation and will be provided to creditors and approved by the Court in conjunction with Court approval at confirmation of the ISG Realty Agreement.  All sales must be cash sales in an "AS-IS, WHERE IS" continue with no representations or warranties.  In preparing the projections attached hereto as Exhibit A, the Debtor was very conservative and has used sales prices of $2,510,000.  The Debtor expects that some units will be listed and in fact sale for more than this amount.

### b.   Sales of Condominium Units and Court Approval.

The Bankruptcy Court will retain jurisdiction over the Debtor and the Property to, among other things, approve any proposed sale of the Property or any unit therein.  In conjunction with said court approval and sale, all secured creditors will be entitled to credit bid their claims.  Any sale motion will be filed in accordance with the notice provisions of the Bankruptcy Code for sales of assets.  Upon the sale of any unit, any net proceeds (net of standard closing costs and broker's fees) will be paid to creditors in their order of priority on account of allowed claims.  The liens of secured creditors will attach to the proceeds of sale of any unit and will be distributed in accordance with the provisions of the Plan.  After payment of any allowed secured claims in the order of priority determined by the Bankruptcy Court, the Debtor will pay approved administrative expenses and any priority claims, and then will disburse to the Class 3 creditors, on a pro-rata basis, any net proceeds once the Debtor has accumulated at least $50,000 to be disbursed.

### 7.   Bankruptcy Code §1111(b) (2) Elections.

Any creditor whose claim is secured by a lien on property may, pursuant to Bankruptcy Code §1111(b)(2), elect to have its entire claim unless said creditor's claim is not recourse and the property subject to the lien is not to be sold under the Plan.  Each creditor must make its own

decision as to whether to make this election and the Debtor reserves the right to challenge any

such election and whether said election is in fact appropriate under the provisions of the

Bankruptcy Code.

Should any Class 1 creditor make such an election, the allowed claim of said creditor will

be paid in the same priority as the allowed secured creditor would have been paid had the

election not been made.  Because the election will not be made prior to the approval of this

Disclosure Statement, the Debtor cannot estimate which Class 1 creditors may make the election

and which will not.  The Debtor is therefore unable to provide any estimates of recovery for

creditors if another creditor should make the election.

### III.

### TREATMENT OF MISCELLANEOUS ITEMS

**A.    Executory Contracts and Unexpired Leases.**

**1.    Assumptions.**

The Debtor has no executory contracts.  Nevertheless, the Confirmation Order shall

constitute an order approving the assumption of any executory contracts should they exist.

**2.    Rejections.**

Any unexpired lease and executory contract of the Debtor that has not been previously

rejected and is not specifically assumed by the Debtor pursuant to the foregoing section shall be

deemed rejected as of the Effective Date of the Plan.  The Confirmation Order shall constitute an

order approving the rejection of the lease or contract.

**THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM**

**ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS THIRTY DAYS**

**AFTER THE EFFECTIVE DATE OF THE PLAN.**  Any claim based on the rejection of an

executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**B.    Changes in Rates Subject to Regulatory Commission Approval.**

This Debtor is not subject to governmental regulatory commission approval of its rates.

**C.    Reservation of Rights and Causes of Action.**

The Reorganized Debtor shall have, retain, reserve and be entitled to assert all claims, causes of action, rights of setoff and other legal or equitable defenses that the Debtor had immediately prior to the Petition Date as fully as if the Debtor's bankruptcy case had not been commenced; and all of the Reorganized Debtor's legal and equitable rights respecting any such claim which is not specifically waived, extinguished, or relinquished by the Plan may be asserted after the Effective Date, including, without limitation, all rights, claims, causes of actions and powers under Bankruptcy Code §§544, 545, 547, 548, 549, and 553.

**D.    Retention of Jurisdiction.**

The Court will retain jurisdiction to the fullest extent provided by law.

**V.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers to basic confirmation issues that they may wish to consider, as well as certain deadlines related to the Plan and potential claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan by the necessary constituencies, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

**A. Who May Vote or Object.**

        **1.    Who May Object to Confirmation of the Plan.**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

        **2.    Who May Vote to Accept/Reject the Plan.**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both: (1) allowed or allowed for voting purposes; and (2) classified in an impaired class.

        **a.    What Is an Allowed Claim/Interest.**

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE was April 27, 2010. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the

Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b.    What Is an Impaired Claim/Interest.

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that Classes 1B to1P, 2, and 3 are impaired and that holders of claims in each of these classes are entitled to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as impaired or unimpaired may file an objection to the Plan contending that the Proponent have incorrectly characterized the class.

### 3.    Who is <u>Not</u> Entitled to Vote.

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code §§507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code §§507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required by the Bankruptcy Code to receive certain specified treatment.

Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.

### 4.    Who Can Vote in More Than One Class.

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.  Unsecured creditors who hold claims in more than one class of unsecured claims are entitled to cast separate ballots in each class.

### 5.    Votes Necessary to Confirm the Plan.

If there are impaired classes under the Plan, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

### 6.    Votes Necessary for a Class to Accept the Plan.

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan.  A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### 7.    Treatment of Non-accepting Classes.

As noted above, even if all impaired classes do not accept the Plan, the Court may still confirm the Plan if the non-accepting classes are treated in a manner consistent with the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the

terms of the Plan is commonly referred to as "cramdown."  the Bankruptcy Code allows the Plan

to be "crammed down" on non-accepting classes of claims or interests if the Plan meets all

consensual requirements except the voting requirements of Bankruptcy Code §1129(a) (8) and if

the Plan does not "discriminate unfairly" and is "fair and equitable" to each impaired class that

has not voted to accept the Plan as referred to in Bankruptcy Code §1129(b) and applicable case

law.

### 8.    Request for Confirmation Despite Non-acceptance by Impaired Classes.

The Debtor believes that the Plan as proposed meets the requirements of Bankruptcy

Code §§1129(a) (8) and 1129(b).  In formulating the Plan, the Debtor discussed the proposed

treatment with the various creditor constituencies and believes that the Plan as formulated will be

supported by sufficient creditors in each class to confirm the Plan.  To the extent necessary, the

Debtor will further address such issues in the context of seeking confirmation of the Plan.

### B. Liquidation Analysis.

Another confirmation requirement is the "Best Interest Test", which requires a liquidation

analysis.  Under the Best Interest Test, if a class of claims or interest holders is impaired and that

class does not vote to accept the Plan, then that class must receive or retain under the Plan

property of a value not less than the amount that such holder would receive or retain if the

Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

creditors are paid first from the proceeds of sale of property on which the secured creditor holds

a lien.  Administrative claims are paid next.  Unsecured creditors are paid from any remaining

sales proceeds after payment of secured and administrative claims, according to their rights to

priority.  Unsecured creditors with the same priority share pro-rata in the distributions to such

creditors.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive in Chapter 7 liquidation. The Proponent believes that liquidation of the Debtor under Chapter 7 would result in a) smaller distributions being made to creditors than those provided in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist the trustee, b) additional expenses and claims, some of which would be entitled to priority which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtor's business operations, and c) the significant difference between the value of the Debtor's assets in a liquidation and its greater value as a going concern.

Set forth on Exhibit D hereto is the Liquidation Analysis of the Debtor's assets (the "Liquidation Analysis") demonstrating that creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive in Chapter 7 liquidation.

## C. Feasibility.

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to

pay all the claims and expenses which are entitled to be paid on such date. As demonstrated below in Exhibit A hereto, the Reorganized Debtor will have sufficient cash on hand from the Financing Proceeds to fund the Plan, thus satisfying this aspect of feasibility. It is anticipated that the Reorganized Debtor will have $2.7 million on hand or available to it in Financing Proceeds on the Effective Date before payment of administrative fees (or the agreed upon portion thereof), payment of the Class 1A Secured Claim, statutory costs and OUST fees (which are anticipated to be paid on an ongoing basis and therefore will be zero on the Effective Date).

The second aspect of feasibility considers whether the Reorganized Debtor will have sufficient cash over the life of the Plan to make the required Plan payments. The Debtor believes that the Financing Proceeds and the proceeds of sale of the Property will be sufficient to provide the Debtor with future working capital necessary to its operations and fund the payments required under the Plan.

The Debtor has provided projected financial information for its projected operations based on the foregoing (the "Projections"), which are attached hereto as Exhibit A. The projection is based on the costs to complete the construction of the Property and to sell it to pay off creditor claims as provided for in the Plan. As noted above, the Projections are conservative in the revenue numbers based on a lower sales price per unit than would be anticipated given valuation advice provided to the Debtor by the Bank and in the Debtor's own estimation. The Projections are prepared based on an allowed Class 1O claim of approximately $13.5 million as this is the amount the Debtor believes will ultimately be allowed.

Because the actual amount of the various claims, particularly the Class 1B to 1P Secured Claims, will not be known until the conclusion of the claims resolution process and it is

impossible to know the amount for which the Property will be sold, it is impossible to determine

the amount of any payments to be made by the conclusion of the Plan.

### D. Risk Factors.

Since the Plan contemplates payments to certain classes over time from the Reorganized

Debtor following the Effective Date, it is possible that the cash from operations of the

Reorganized Debtor will be insufficient to pay all the obligations created under the Plan.  It is

also possible that the costs of completion could be different than projected or that creditor claims

could be asserted and/or allowed at amounts in excess of what the Debtor believes is currently

likely.  The Debtor with the assistance of its professionals has prepared cash flow Projections

attached as Exhibit A for the 15 months following the Effective Date (because the Debtor

anticipates that the Property will be completed and sold within 15 months) and believes that the

Projections are conservative, based upon the Debtor's prior experience in operating its business,

and current economic conditions.  While no projections can be guaranteed to be completely

accurate, the Debtor believes that the business plan upon which the Plan is premised is

reasonable under the circumstances and achievable by the Reorganized Debtor.  However, the

Debtor can make no representations regarding the Reorganized Debtor's ability to meet such

projections if current economic conditions were to change dramatically.

### E. Tax Consequences of Plan.

The Debtor does not anticipate that confirmation of the Plan will have a significant or

material effect on its tax liability.  CREDITORS AND INTEREST HOLDERS CONCERNED

WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT

WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following

disclosure of possible tax consequences is intended solely for the purpose of alerting readers

about possible tax issues this Plan may present to the Debtor.  The Debtor CANNOT and DOES

NOT represent that the tax consequences contained below are the only tax consequences of the

Plan because the Tax Code embodies many complicated rules that make it difficult to state

completely and accurately all the tax implications of any action.  Creditors and Interest holders

whose interests are affected under the Plan are urged to consult their own tax advisors regarding

the tax implications of the Plan for any particular individual or entity affected by the Plan.

## VI.

### EFFECT OF CONFIRMATION OF PLAN

**A.      Discharge.**

Upon the entry of a final decree closing the Debtor's bankruptcy case, the Debtor shall

not receive a discharge as the Plan is basically a liquidation plan.  No liability imposed by the

Plan will be discharged.

**B.      Modification of Plan.**

The Debtor may modify the Plan at any time before confirmation.  However, the Court

may require a new disclosure statement and/or re-voting on the Plan if Proponent modifies the

Plan before confirmation.  The Debtor may also seek to modify the Plan at any time after

confirmation as long as: (1) the Plan has not been substantially consummated; <u>and</u> (2) if the

Court authorizes the proposed modifications after notice and a hearing.

**C.      United States Trustee Fees.**

The Reorganized Debtor shall be responsible for timely payment of fees incurred

pursuant to 28 U.S.C. §1930(a) (6) until the entry of a final decree closing the Debtor's

bankruptcy case.  After confirmation, the Reorganized Debtor shall file with the Bankruptcy

Court and serve on the United States Trustee a quarterly financial report regarding all income and disbursements, including all plan payments, for each quarter (or portion thereof) that the case is still open.

### D.    Post-Confirmation Conversion/Dismissal.

A creditor or party in interest may bring a motion to convert or dismiss the case under Bankruptcy Code §1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will re-vest in the Chapter 7 estate, and the automatic stay will be re-imposed upon the re-vested property only to the extent that relief from stay was not previously granted by the Court during this case.

### E.    Post Confirmation Status Reports.

The Reorganized Debtor or attorney of record in this case shall comply fully with the requirements of Local Bankruptcy Rule 3020-1, and in connection therewith file with the Bankruptcy Court a status report within 120 days of the entry of the order confirming the Plan, and every six months thereafter, describing the Reorganized Debtor's progress toward plan consummation until the Plan is fully consummated.

### F.    Post Confirmation Employment and Compensation of Professionals.

Following entry of the Confirmation Order, the Reorganized Debtor may employ, without notice, hearing or order of the Bankruptcy Court, such attorneys and other professionals as it may desire to render services on such terms as it deems reasonable.  The Reorganized Debtor shall be authorized to pay for services and related costs of such professionals without necessity of approval of the Bankruptcy Court.

**G.    Final Decree.**

At such time as the Debtor's estate has been fully administered as referred to in

Bankruptcy Rule 3022, the Reorganized Debtor or attorney of record shall file an Application for

Final Decree and the proposed Final Decree closing the Debtor's bankruptcy case.


Dated: June 4, 2010                    Carbon Beach Partners, LLC, a

                                       Delaware Limited Liability Company



                              By:    _____/s/  **Michael Kest**_____
                                        Michael Kest, President
                                        Jordinia Operations, Inc.,
                                        Manager

**Exhibit A**
**Projections for Plan of Reorganization**
**and Costs to Completion Construction of Property**

Note:  The attached projections contain a category described as "Deferred Costs."  This includes the cost of appliances and finishes such as tile, counter tops and flooring, which will be chosen by the buyer for each unit and installed prior to closing or included as a credit in the purchase price.  Thus, these costs are shown as an offset to revenue as they will likely be paid from the closing proceeds.

**VILLAS AT CARBON BEACH**
**PROJECT CASH FLOW**
3/5/2010

| ASSUMPTIONS | |
|---|---|
| Average Unit Size | 3,200 |
| Average Price per Foot | $ 784.38 |
| Average Retail Price | $2,510,000 |
| Absorption | 2 / month |

| | Assumptions | Total | 0 Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES ACTIVITY** | | | | | | | | | | | | | | | | | | |
| Unit Starts | | 8 | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | |
| Cumulative Starts | | 8 | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | |
| Unit Completions | | 8 | | | | | | | | | 8 | | | | | | | | 8 |
| Cumulative Completions | | 8 | | | | | | | | | 8 | | | | | | | | 8 |
| Sales | | 8 | | 1 | 1 | 1 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 1 | 1 |
| Cumulative Sales | | 8 | | 1 | 1 | 1 | | | 1 | 3 | 1 | 1 | 1 | 6 | 7 | 8 | 1 | 8 |
| Closings | | 8 | | | | | | | | | 1 | 3 | 4 | 5 | 6 | 7 | 8 | 8 |
| Cumulative Closings | | 8 | | | | | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| **REVENUES** | | | | | | | | | | | | | | | | | | |
| Sales Revenue | | 20,080,000 | | | | | | | | | 2,510,000 | 2,510,000 | 2,510,000 | 2,510,000 | 2,510,000 | 2,510,000 | 2,510,000 | 2,510,000 |
| Average Lot Premium | 10,000 | | | | | | | | | | | | | | | | | |
| Less: | | | | | | | | | | | | | | | | | | |
| City Fee | (30,000) | (240,000) | | | | | | | | | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) |
| Commissions | -5.0% | (1,004,000) | | | | | | | | | (125,500) | (125,500) | (125,500) | (125,500) | (125,500) | (125,500) | (125,500) | (125,500) |
| Closing Costs | -1.0% | (200,600) | | | | | | | | | (25,100) | (25,100) | (25,100) | (25,100) | (25,100) | (25,100) | (25,100) | (25,100) |
| 3 Finish Work (Paid at Closings) | (74,616) | (596,928) | | | | | | | | | (74,616) | (74,616) | (74,616) | (74,616) | (74,616) | (74,616) | (74,616) | (74,616) |
| | (5,000) | (40,000) | | | | | | | | | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Net Sales Revenue | | 17,998,272 | | | | | | | | | 2,249,784 | 2,249,784 | 2,249,784 | 2,249,784 | 2,249,784 | 2,249,784 | 2,249,784 | 2,249,784 |
| Cumulative Sales Revenue | | 17,998,272 | | | | | | | | | 2,249,784 | 4,499,568 | 6,749,352 | 8,999,136 | 11,248,920 | 13,498,704 | 15,748,488 | 17,998,272 |
| **COSTS** | | | | | | | | | | | | | | | | | | |
| Loan Payoff | | | | | | | | | | | | | | | | | | |
| 2 Developer Overhead | per budget | 170,000 | | 170,000 | | | | | | | | | | | | | | |
| 2 Property Taxes | per budget | 200,235 | | 66,745 | | | | | 66,745 | | 66,745 | | | | 66,745 | | | |
| 1 Insurance | per budget | 174,408 | | 174,408 | | | | | | | | | | | | | | |
| 1 Marketing Overhead | per budget | 80,000 | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | | | | | | |
| 1 Legal Expense | 10,000 | 75,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| 1 Bankruptcy Expense | | 15,000 | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | |
| 2 Other Indirects | | 110,000 | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | |
| 1 General Conditions | | 77,501 | | | 19,375 | 19,375 | 19,375 | | | | | | | | | | | |
| 2 Site Work/Landscaping | 19,375 | 344,631 | | | 172,315 | 172,315 | | | | | | | | | | | | |
| 2 Direct Costs | per budget | 881,457 | | | 293,819 | 293,819 | 293,819 | | | | | | | | | | | |
| 2 Finish Work (Paid at Closings) | | | | | | | | | | | | | | | | | | |
| 2 Contractor Fee | | 100,000 | | 25,000 | 25,000 | 25,000 | 25,000 | | | | | | | | | | | |
| 2 Loan Points on $2.7M | 3.0% | 81,000 | | 81,000 | | | | | | | | | | | | | | |
| 2 Security | | 40,420 | | 5,052 | 5,052 | 5,052 | 5,052 | 5,052 | 5,052 | 5,052 | 5,052 | | | | | | | |
| 1 Previously Paid | | 77,713 | | 77,713 | | | | | | | | | | | | | | |
| 1 Management Fee | 12.0% | 150,000 | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| 2 Interest - Priming Loan | 6.0% | 147,367 | | | 6,109 | 12,361 | 18,675 | 23,329 | 26,428 | 27,778 | 27,778 | 46,923 | 36,013 | 25,049 | 14,031 | 3,291 | | |
| 2 Interest - Builders Bank - $13.5M | | 655,214 | | | 67,500 | 67,500 | 67,500 | 67,500 | 67,500 | 67,500 | 67,500 | | | | | | | |
| Contingency | | 100,000 | | | | | | | | 10,000 | 10,000 | | | | | | | |
| **TOTAL COSTS** | | 3,479,946 | | 610,919 | 625,171 | 631,423 | 465,422 | 176,257 | 133,644 | 134,981 | 231,331 | 152,746 | 67,923 | 57,013 | 46,049 | 101,776 | 24,291 | 21,000 |
| **CASH FLOW** | | 14,518,326 | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,097,038 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| **CASH RESERVE BALANCE** | | | | | | | | | | | | | | | | | | |
| Investment | | 14,518,326 | | | | | | | | | | | | | | | | |
| Cumulative Investment | | 14,518,326 | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| Net Cash Balance | | | | | | | | | | | | | | | | | | |
| Interest Accrual | 0.0% | | | | | | | | | | | | | | | | | |
| Cash Balance | | | | | | | | | | | | | | | | | | |
| **PRIMING LOAN** | | | | | | | | | | | | | | | | | | |
| Investment | | 14,518,326 | | | | | | | | | | | | | | | | |
| Equity | | | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| Debt | | 14,518,326 | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| Cumulative Debt | | | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| Interest Payments | | | | | | | | | | | | | | | | | | |
| Project Cash Flow | 0.0% | 14,518,326 | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |
| **BUILDERS BANK** | | | | | | | | | | | | | | | | | | |
| Investment | | 14,518,326 | | | | | | | | | | | | | | | | |
| Equity | | | | | | | | | | | | | | | | | | |
| Debt | | (13,500,000) | | (13,500,000) | (13,500,000) | (13,500,000) | (13,500,000) | (13,500,000) | (13,500,000) | (13,500,000) | (9,384,509) | (7,202,648) | (5,009,877) | (2,806,142) | (658,134) | 1,567,359 | 3,796,143 | |
| Cumulative Debt | | (13,500,000) | | (13,500,000) | | | | | | | | | | | | | | |
| Interest Payments | | | | | | | | | | | | | | | | | | |
| Project Cash Flow | 0.0% | 1,018,326 | | (610,919) | (625,171) | (631,423) | (465,422) | (176,257) | (133,644) | (134,981) | 2,018,453 | 2,181,861 | 2,192,771 | 2,203,735 | 2,148,008 | 2,225,493 | 2,228,784 |

CONSTRUCTION COST TO COMPLETE
PROJECT NAME:
PROPERTY ADDRESS:
CONTRACTOR'S NAME:
DATE

**VILLAS AT CARBON BEACH**
**22065 PACIFIC COAST HWY, MALIBU CA 90265**
**TBD**
**March 5, 2010**

| # | ITEM | DESCRIPTION | original budget | BID | VE Changes | Paid thru RCVR | CBP Adjustments | REMAINING COST | Deferred Costs |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | **LAND** | | | | | | | | |
| 4 | Improved Land Cost | | | | | | | N-A | 0 |
| 5 | Interest/Loan fees | | | | | | | N-A | 0 |
| 6 | **Sub-total # 1: LAND** | | | | | | | **0** | |
| 7 | | | | | | | | . | |
| 8 | **INDIRECT CONSTRUCTION** | | | | | | | | |
| 9 | Plans/Architect/Interior Des. | | 55,750 | 55,750 | 30,000 | (70,498) | (15,252) | 0 | |
| 10 | Plans/Landscape Architect | | 50,000 | | | (32,732) | (17,268) | 0 | |
| 11 | Engineering | acoustical,civil, consultns | 60,000 | | | (19,410) | (40,590) | 0 | |
| 12 | Acct./Legal | | 10,000 | | | (3,660) | (6,340) | 0 | |
| 13 | Permits/Fees/Assessments | | 16,000 | | 50,000 | (57,439) | (8,561) | 0 | |
| 17 | Security | | 100,000 | | 50,000 | (131,723) | 22,143 | 40,420 | |
| 17 | utilities | | 60,000 | | | (6,247) | (46,253) | 7,500 | |
| 17 | temporary fencing & temp toilets/dumpsters | | 20,000 | | 10,000 | (19,091) | (909) | 10,000 | |
| 17 | receiver fees | | 150,000 | | 75,000 | (137,679) | (87,321) | 0 | |
| 14 | Miscellaneous - recvr gc cm temp 9/15/09 | peveler | 30,000 | | 8,800 | (38,800) | 0 | 0 | |
| 15 | **Sub-total #2: GENERAL** | | 551,750 | 55,750 | 223,800 | (517,279) | (200,350) | 57,920 | |
| 16 | | | | | | | | | |
| 17 | **SITE WORK** | | | | | | | | |
| 18 | | | | | | | | | |
| 19 | **SITE** | | | | | | | | |
| 20 | Erosion control / Grading | | 15,000 | | | (6,419) | | 0 | |
| 25 | Utility trenching | | | | | | | 8,581 | |
| 26 | Drainage | | 25,000 | | | | | N-A | |
| 27 | Sewer | move storm line for ret wall | 15,000 | | 3,526 | (28,526) | (15,000) | 0 | |
| 28 | Water | topanga ug water and septic | 159,252 | 159,252 | | (159,252) | | 0 | |
| 29 | Street lights | | | | | | | 0 | |
| 30 | Street improvements | | | | | | | Not included / Future | |
| 31 | Survey/Engineering | | 10,000 | | | | | 10,000 | |
| 32 | Soils - Testing | | 5,000 | | | | | 5,000 | |
| 33 | **Sub-total: OFF-SITE** | | 229,252 | 159,252 | 3,526 | (194,197) | (15,000) | 23,581 | |
| 34 | | | | | | | | | |
| 35 | **ON-SITE** | | | | | | | | |
| 36 | **HARDSCAPE** | | | | | | | | |
| 37 | Concrete | Side Walk | 30,800 | 30,800 | | (5,000) | | Not included / Future | |
| | **colored site conc walks and stair fix** | perimeter and back | | | | | | 25,800 | |
| | **driveway and parking lot** | washed gravel | 80,000 | 80,000 | (10,000) | (10,000) | (35,000) | 25,000 | |
| 38 | **SOFTSCAPE** | Driveway and Walkways | | | | | | 0 | |
| 39 | **SOFTSCAPE** | | | | | | | | |
| 40 | Landscape - Plants and Lighting | Labor and Material | | | | | | see below | |
| 41 | **CONCRETE** | | | | | | | . | |

CONSTRUCTION COST TO COMPLETE
PROJECT NAME:
PROPERTY ADDRESS:
CONTRACTOR'S NAME:
DATE

**VILLAS AT CARBON BEACH**
22065 PACIFIC COAST HWY, MALIBU CA 90265
TBD
March 5, 2010

| # | ITEM | DESCRIPTION | original budget | BID | VE Changes | Paid thru RCVR | CBP Adjustments | REMAINING COST | Deferred Costs |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 42 | Curb/gutter | Street | | | | | | n/a | |
| 43 | Concrete Sawcut | Street Walkway, Curb, & Gutter | 40,000 | 40,000 | | | (40,000) | IN DRIVEWAY | |
| 44 | **MASONRY** | | | | | | | 0 | |
| 47 | Block Walls | Trash Enclosure and street | 75,000 | 75,000 | | | 0 | 75,000 | |
| 48 | **METALS** | wall & back wall | | | | | | 0 | |
| 49 | Steel columns & beams | Portic arch | | | | | | INCLUDED ON #78 | |
| 51 | Stairs & railings | Entry handrail | 10,000 | | | | | 10,000 | |
| 52 | Metal doors | Trash enclosure doors | 1,500 | | | | | 1,500 | |
| 53 | Metal service doors | Gate and Motors | 25,000 | | | | 0 | 0 | |
| 55 | Wrought iron | Doors and Fence | 20,000 | | | | (25,000) | 20,000 | |
| 56 | Fencing / Chainlink | Perimeter fence | 25,000 | 25,000 | | | (25,000) | 0 | |
| 58 | **THERMAL & MOISTURE** | | | | | | | 0 | |
| 58 | Waterproofing - repairs | rear unit 8 & elev pit unit 1 and side gar doors | 11,248 | 11,248 | 5,000 | (11,248) | | 5,000 | |
| 59 | Waterproofing | Planters between buildings | | | | | | INCLUDED ON #98 | |
| 60 | Sheetmetal | | | | | | | INCLUDED ON #84 | |
| 61 | **FINISHES** | | | | | | | 0 | |
| 62 | Lath and Plaster | Trash enclosure and walls | | | | | | INCLUDED ON #120 | |
| 63 | Ceramic/Stone Tile | Privacy wall and stairs | 15,000 | | | | 0 | 15,000 | |
| 64 | **ELECTRICAL** | | - | - | | | | | |
| 66 | Electrical | Power-Landscape-low voltage | 10,000 | | | | | 10,000 | |
| 69 | | Power - Gate | in gate | in gate | | | | in gate | |
| 70 | | Parking - Lights | 7,500 | | | | | 7,500 | |
| 72 | | Security Camera | 5,000 | 5,000 | | | | 5,000 | |
| 72 | Electrical fire alarm Systems completion and repai | Rebakk hannan | 106,400 | 106,400 | | (106,400) | | 0 | |
| 73 | Elevator Systems completion and repair | McKinley rvr | 56,295 | 56,295 | 4,000 | (56,295) | | 4,000 | |
| 74 | Fire Sprinklers completion | Cornerstone | 13,032 | 13,032 | | (13,032) | | 0 | |
| 73 | **SOFTSCAPE** | | | | | | | 0 | |
| 74 | landscape trees and materials | allowance | 75,000 | | | (2,500) | (11,250) | 61,250 | |
| 74 | Landscape - Plants and Lighting | **SOME LANDSCAPE** | 110,000 | | | (40,000) | (14,000) | 56,000 | |
| 76 | **RETAINING WALLS** | labor & irrigation | | | | | | | |
| 77 | Keystone rear ret wall repair | TOTAL | 91,850 | 91,850 | | | | 0 | 91,850 |
| 78 | | Repair - $84,050 | | | | | | | Needs further Investigation |
| 79 | | Back planter wall - | | | | | | | |
| 80 | | Front planter wall - $7,800 | | | | | | | |

CONSTRUCTION COST TO COMPLETE
PROJECT NAME:
PROPERTY ADDRESS:
CONTRACTOR'S NAME:
DATE

VILLAS AT CARBON BEACH
22065 PACIFIC COAST HWY, MALIBU CA 90265
TBD
March 5, 2010

| 1 | ITEM | DESCRIPTION | original budget | BID | VE Changes | Paid thru RCVR | CBP Adjustments | REMAINING COST | Deferred Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2 | | | | | | | | | 91,850 |
| 85 | **Sub- total ON-SITE** | | **1,267,129** | **853,129** | **6,052** | **(632,870)** | **(180,250)** | **321,050** | **91,850** |
| 87 | | | | | | | | | |
| 89 | **Sub-total #3: SITE WORK** | | **1,496,381** | **1,012,381** | **9,578** | **(827,067)** | **(195,250)** | **344,631** | **91,850** |
| 90 | | | | | | | | | - |
| 91 | **DIRECT CONSTRUCTION** | | | | | | | | |
| 92 | **CONCRETE** | | | | | | | - | |
| 93 | Flooring | | | | | | | N-A | |
| 94 | **MASONRY** | | | | | | | | |
| 95 | Fireplace | | | | | | | N-A | |
| 96 | **METALS** | | | | | | | | |
| 97 | Rough hardware | | | | | | | INCLUDED ON # 55 | |
| 98 | Steel columns & beams | Balconies and Entry arch | 140,448 | 140,448 | | | 4,552 | 25,000 | |
| 100 | Stairs & railings | Interior handrail and railing | | | | | | 0 | |
| 101 | | Demo exterior railing - Railing and Stairs | 16,200 | 16,200 | | | | 16,200 | |
| 103 | Metal fireplace | Riase 6' Living Change to elect Master & Roof | 25,960 | 25,960 | | (20,960) | | 5,000 | |
| 104 | Sheetmetal | Sheet metal to complete job and fix rust | 25,000 | | | | | 25,000 | |
| 106 | Gutters and Downspots | Gutters and Downspots | | | | | | INCLUDED above | |
| 107 | **WOOD & CARPENTRY** | | | | | | | - | |
| 108 | Rough carpentry | Interior and exterior framing | 322,000 | 322,000 | (170,000) | 0 | (102,000) | 50,000 | |
| 109 | Hardware | | | | | | | INCLUDE ON # 64 | |
| 110 | Framing Crane | | | | | | | INCLUDE ON # 64 | |
| 111 | Rough lumber | Material | 50,000 | 50,000 | | | (30,000) | 20,000 | |
| 112 | Finish carpentry - Material | Base, Coat Closet, Inst. Wd & Dr, Elevator finish, | 25,600 | 25,600 | | | (5,600) | 20,000 | |
| 113 | Finish Carpentry - Labor | Garage base, & inst- Dr hardw & stops, & Bath fixt | | | | | | INCLUDED ON above | |
| 115 | Interior Doors and Windows | Material - Interior Window for Office | 2,361 | 2,361 | | | | in finish carp | |
| 116 | Finish hardware | Entry door Hardware | 4,445 | 4,445 | | | | 4,445 | |
| 117 | Cabinets / Materials | Material and Installation - Unit 1 &2 | 51,000 | 51,000 | | (20,000) | | 31,000 | |
| 118 | Hardwood Floor | Material and Installation unit 1 &2 | 10,410 | 10,410 | | | (10,410) | 0 | |
| 119 | **THERMAL & MOISTURE** | | | | | | | - | |
| 120 | Waterproofing | Balconies and Roof Deck | | | | | | 0 | |
| 121 | Hot Mop - Showers | Master shower and Bath 3 - unit 1 & 2 only | 105,358 | 105,358 | (5,358) | | (30,000) | 70,000 | |
| 122 | Roofing | Roof Deck finish | 7,025 | 7,025 | (2,025) | | | 5,000 | |
| 123 | Insulation | Insulation | 50,000 | | | | (40,000) | 10,000 | |
| 124 | | Polycell | 16,000 | | | | | 16,000 | |
| 125 | **WINDOWS/DOORS - GLASS** | | 450 | | | | | INCLUDED ON # 77 | |
| 127 | Window Labor | Remove and Installation of New Wds & Drs | 44,735 | 44,735 | | | (44,735) | 0 | |
| 128 | Windows / Materials | Clad/Wood Ext Wds & Drs-Sound enhanced Glass | 235,200 | 235,200 | | (98,100) | (137,100) | 0 | |

CONSTRUCTION COST TO COMPLETE
PROJECT NAME:
PROPERTY ADDRESS:
CONTRACTOR'S NAME:
DATE

**VILLAS AT CARBON BEACH**
**22065 PACIFIC COAST HWY, MALIBU CA 90265**
**TBD**
**March 5, 2010**

| ITEM | | DESCRIPTION | original budget | BID | VE Changes | Paid thru RCVR | CBP Adjustments | REMAINING COST | Deferred Costs |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 129 | Roof Deck level 2' high cont glass | Door - Roof deck | 16,490 | 16,490 | | | | 16,490 | |
| 129 | | tempered butt glazing | | | | | | 0 | |
| 130 | Shower Doors/Mirrors | Shower door, Tub door, and Mirrors | 41,760 | 41,760 | | | (13,760) | 28,000 | |
| 131 | Tubs/Enclosures | | | | | | | INCLUDED ON # 83 | |
| 132 | Glass railing | | | | | | | INCLUDED ON # 58 | |
| 133 | FINISHES | | | | | | | | |
| 134 | Drywall | Interior Drywall parches & fix | 25,000 | | | | (10,000) | 15,000 | |
| 135 | Painting | TOTAL | 142,350 | 142,350 | | | (82,350) | 60,000 | |
| 136 | | Interior | 128,000 | 128,000 | Interior & | | | INCLUDE ON # 88 | |
| 138 | | Garages | 12,350 | 12,350 | Garage walls | | | INCLUDE ON # 88 | |
| 139 | | Wood Siding | 2,000 | 2,000 | No | | | INCLUDE ON # 93 | |
| 140 | Fireplace Surrounds | | | | | | | | |
| 142 | Granite/Slab/Tile/Ceramic | M&T - Floor, Showers, Countertops, Stone Cap | 250,000 | 250,000 | | | | | 250,000 |
| 143 | Floor Sealing | (SAVINGS if don't do 4-8) | 62,523 | 62,523 | | | | | 166,523 |
| 144 | Floor covering | Material and Installation - Carpet | 198,500 | 198,500 | (40,000) | | 144,000 | | 0 |
| 145 | Lath and Plaster | TOTAL | 198,500 | 198,500 | (20,000) | | (58,500) | 120,000 | |
| 146 | | Stucco&Demo $182,960 | | in above | | | | | |
| 147 | | Staging - sides - $6800 | | | | | | | |
| 148 | | Staging in front - budget guess | in above | in above | | | | | |
| 149 | SPECIALTIES | | | | | | | | |
| 150 | Garage door - rolling shutter grill | Entry to Garage | 20,000 | | | | (10,000) | 10,000 | |
| 151 | Spa | Material and Delivery to place of installation | 79,337 | 79,337 | | | (34,337) | 45,000 | |
| 152 | Mailbox | | | | | | 1,450 | 1,450 | |
| 153 | EQUIPMENT | | | | | | | | |
| 154 | Built-in appliances | Material and Delivery | 176,405 | 176,405 | | | | | 176,405 |
| 155 | Built-in appliances - Installation | Installation of Appliances | 4,000 | 4,000 | | | | | 4,000 |
| 157 | MECHANICAL | | | | | | | | |
| 158 | Plumbing plus fix h20 vents | TOTAL | 168,090 | 168,090 | 15,000 | | 0 | 183,090 | |
| 159 | | Rough and Finish - $47,088 | | | | | | INCLUDE ON # 108 | |
| 160 | | Fixtures & hot water htr fix - $121,002 | | | | | | INCLUDE ON # 108 | |
| 162 | Electrical | Conventional electric - Labor and Material | 75,450 | 75,450 | (20,000) | | (35,450) | 20,000 | |
| 163 | | Elevator | 103,747 | 103,747 | (103,747) | | 10,000 | 10,000 | |
| 164 | | A/V - Surround Sound / Intercom | 14,000 | 14,000 | (14,000) | | | 0 | |
| 166 | Electrical fixtures | Fixtures - Interior and exterior of Building | 35,460 | 35,460 | | | | 35,460 | |
| 167 | HVAC | Labor and Material to complete | 30,000 | | | | (15,000) | 15,000 | |
| 168 | Fire Sprinklers | Labor and Material to complete - new stairs | 4,322 | 4,322 | | | | 4,322 | |
| 169 | Security System | Labor and Material to previre | 20,000 | | | | | 20,000 | |

CONSTRUCTION COST TO COMPLETE
PROJECT NAME:
PROPERTY ADDRESS:
CONTRACTOR'S NAME:
DATE

VILLAS AT CARBON BEACH
22065 PACIFIC COAST HWY, MALIBU CA 90265
TBD
March 5, 2010

| 1 | ITEM | DESCRIPTION | original budget | BID | VE Changes | Paid thru RCVR | CBP Adjustments | REMAINING COST | Deferred Costs |
|---|------|-------------|-----------------|-----|------------|----------------|-----------------|----------------|----------------|
| 2 | | | | | | | | | |
| 170 | GENERAL CONDITIONS | | | | | | | | |
| 171 | Clean-up | Cleaning | 75,000 | | | (5,000) | (30,000) | 40,000 | |
| 172 | Dumpster Fees | Trash | 15,000 | | | (5,000) | | 10,000 | |
| 173 | Rental Equipment | For Exterior work | 10,000 | | | | | 10,000 | |
| 174 | Sub-total #4: direct construction | | 2,841,976 | 2,555,526 | (360,130) | (269,060) | (529,240) | 941,457 | 596,928 |
| 175 | | | | | | | | | |
| 176 | Total 1 | | 4,890,107 | 3,623,657 | (126,752) | (1,613,406) | (924,840) | 1,344,008 | 688,778 |
| 178 | Supervision | | 100,000 | 100,000 | | | 50,000 | 150,000 | |
| 179 | Contingency -5% | | | | | | | 0 | |
| 180 | Miscellaneous Supplies | | 20,000 | | | | | 20,000 | |
| 181 | Contractor Fee | | 150,000 | 150,000 | 25,000 | (75,000) | 0 | 100,000 | |
| 182 | Total 2 | | 270,000 | 250,000 | 25,000 | (75,000) | 50,000 | 270,000 | |
| 183 | | | | | | | | | |
| 184 | Total Construction Costs: | | 5,160,107 | 3,873,657 | (101,752) | (1,688,406) | (874,840) | 1,614,008 | 688,778 |
| 185 | | | | | | | | | |
| 186 | FINANCING COSTS | | | | | | | | |
| 187 | Construction loan fee | | | | | | | 0 | |
| 188 | Interest reserve | | | | | | | 0 | |
| 189 | Title, Recording and Doc Fees | | | | | | | 0 | |
| 190 | Real Estate Taxes | | 99,595 | | 200,235 | (99,595) | | 200,235 | |
| 191 | Insurance - builders Risk | verify | 260,000 | | 150,000 | (235,592) | 0 | 174,408 | |
| 192 | Appraisal fees/Environ. | | | | | | | 0 | |
| 193 | Inspections/cost analysis | | | | | | | 0 | |
| 194 | Fund Control | | | | | | | 0 | |
| 195 | Sub-total: financing | | 0 | | | | | 0 | |
| 196 | Base Building and Receiver work | completed as of 8-26-09 | | | | | | | |
| 197 | TOTAL PROJECT COST | | 5,519,703 | 3,873,657 | 248,483 | (2,023,593) | (874,840) | 1,988,652 | 688,778 |

**Exhibit B**
**Resume of MS Walker**
**General Contractor Candidate**

# M.S. WALKER
## *Construction Services, Inc.*

### GENERAL CONSTRUCTION | CONSTRUCTION MANAGEMENT



# A HISTORY OF EXCELLENCE

We are a Construction Management and General Contracting company that specialize in commercial, industrial, and residential development & construction. Since the inception, the firm has grown to over 200 employees with annual revenues in excess of 100 million a year in construction projects. We have successfully grown at a rate of more than 20% a year and we continue to implement the business plan to advance the pattern of success. Our offices are currently located in Texas, California and Arizona, with branch offices throughout the Western United States.

M.S. Walker ranks among the foremost organizations in the Western United States, while implementing its expansion into the Central Texas market and Arizona.  Our progress is based on an established business plan and the latest demographics from the University of Pennsylvania's Wharton School real estate department; which states the biggest growth areas between now and 2020 will be warm-weather locations with California, Arizona and Central Texas leading the way.

*The firm provides construction management and general contracting services on a single-responsibility basis. Our projects include; Shopping Centers, Industrial Centers, Hotels, Restaurants, Food Industry Projects, Medical & Surgical Centers, Educational Facilities, Public Works, Retail, Office & Commercial Buildings, Apartments and Land Developments.  Our divisions include;  MSW Construction Services, Inc.,  Walker Booth General Engineering, Inc., WW Steel Fabrication, Inc. and a pre-engineered metal building distributorship.  Through our vertical integration staffing, we can completely control the critical paths of our projects.*

Our experience and professionalism have earned us an enviable reputation among corporate clients, developers, and public agencies that repeatedly select our company based on its leadership in design-build delivery and its consistent record of performance. This commitment to excellence is evident in the way we conduct our business in the Central Texas market as well as the Western region of the U.S.A.

1-866-679-2553

M.S. WALKER
*Construction Services, Inc.*


La Belsera Inn & Suites



*The Orchard at Hageman Retail Center*



*Pegasus Business Centre*



*Delta Business Centre*



*La Bellasera Hotel & Suites Lobby*



M.S. WALKER
Construction Services, Inc.



*The Orchard Retail Center*





PEGASUS BUSINESS CENTER

# SERVICES

## Construction

*Constructability Reviews*
*Value Engineering Reviews*
*Construction Cost Estimates*
*Construction Schedules*
*Construction Documentation*
*On-Site Construction Supervision*
*Bid Documentation & Management*
*Project Job Costing & Accounting*
*Quality Control*

## Concrete & General Engineering

*Grading*
*Paving*
*Site Concrete*
*Structural Concrete*
*Parking Garages*
*Site Utilities*
*Sack & Patch*

## Pipe & Steel Fabrication

*Structural Steel Fab & Erection*
*Steel Columns*
*Joist & Deck*
*Rolled Pieces*
*Stair Systems*
*Steel Moment Frames*
*LA City Approved*



Coffee Centre Office

4813


Plaza Retail Center


JERSEY MIKE'S SUBS


Olive Drive Retail Center


The Orchard Retail Center


Deer Valley Office Complex


Redhawk Office Complex

M.S. WALKER
Construction Services, Inc.



M.S. WALKER
Construction Services, Inc.

## MISSION/VISION STATEMENT

M.S. Walker Construction Services, Inc.. is striving to become the Premier Construction Service Firm in the Western United States that delivers the highest quality projects, on time, at competitive prices, resulting in client satisfaction, respect from competitors and vendors based upon the foundation of integrity, dependability, teamwork and total quality management by:

- *Providing professional services that exceed Client expectations.*
- *Providing a quality work environment to attract, develop and retain top personnel.*
- *Providing our Staff with the leading technology available to perform their tasks.*
- *Building long-term relationships with our Clients by earning their trust and respect.*
- *Achieving a fair profit in order to fund investments in our Staff, resources, and new initiatives*

*The Total Solution to your Construction & Construction Management Needs.*



Buck Owens Crystal Palace

## DIVISIONS & SPECIALTIES

- Assisted Living
- Business Parks
- Hospitality – Hotels
- Hospitality – Restaurants
- Industrial Parks
- Manufacturing Facilities
- Medical Office
- Medical Ambulatory Surgical Centers
- Medical Skilled Nursing Facilities
- Medical Specialty Clinics
- Mini-Storage Facilities
- Multifamily
- Office & Office Parks
- Religious Facilities
- Retail
- Shopping Centers
- Tenant Improvements
- Office - Medical | Commercial | Industrial | Retail






Plaza on Calloway


The Plaza at Hageman


Chuy's Mesquite Broiler


Del Taco


Chuy's Mesquite Broiler


Panera Bread


Homewood Suites

M.S. WALKER
Construction Services, Inc.

# MSW CONSTRUCTION SERVICES, INC.

**MSW** Construction Services, Inc. Staff has led in the construction and construction management of over 2000 projects valued in excess of $1 billion dollars in the past 20 years of service. The construction and management of a project are determined early on when the decision is made as to the type of delivery method. M.S. Walker Construction Staff is trained in all of the delivery methods whether they are managing a traditional bid project, a design-build project, or if we are the construction managers for a project. Although each delivery method has substantial differences, our Staff is capable of managing each project with its individual delivery method and schedule. Through the integration of project managers, project engineers, estimators, superintendents and administration Staff we manage each individual project as required. Our Construction Staff uses the latest technological software to manage each project. By using this technology it enables the company to communicate and manage each project more efficiently.

## TENANT IMPROVEMENTS

**B**y providing design and build-out services for all types of tenant improvements, our clients are insured a seamless process from completion of the building core and shell to opening day of their business. During construction, our commitment is to ensure that each suite is completed to the highest quality standards and delivered in a timely manner.

Our extensive experience in medical, dental and surgical suites as well as general and professional office suites, allows us to provide a program designed to meet the needs of each client regarding space planning, construction and budgetary requirements.

MSW performs Tenant Improvement (TI) work with strict adherence to project time lines and specifications. We can perform any type of project from simple office space build-outs to demanding specialty projects in any sector. Our familiarity with various local codes and regulations and our expertise at project logistics ensure project completion on time, on budget and with a minimal disruption to ongoing business operations.

**M**SW has competed in the tenant improvement business for close to 20 years and we have built an excellent reputation for quality & performance. We have worked on virtually every type of investor, developer, or institutionally owned building in the market. Our project managers, administrative staff and field superintendents are prepared to provide you with construction services in any or all of the following areas:

- Office Tenant Improvements
- Commercial Tenant Improvements
- Medical Tenant Improvements
- Industrial Tenant Improvements
- Retail Tenant Improvements



Acura of Bakersfield

## CONSTRUCTION & CM SERVICES

- Pre-Construction Services
- Constructability Reviews
- Value Engineering Reviews
- Construction Cost Estimates
- Construction Scheduling
- Construction Documentation
- On-Site Construction Supervision
- Bid Documentation & Management
- Quality Control
- Project Job Costing & Accounting
- Certificates of Occupancy
- Punchlist Coordination
- Warranty Documentation & Management
- Equipment - Furniture Procurement
- Facility Training



M.S. WALKER
*Construction Services, Inc.*



Poway Office Park

M.S. WALKER
Construction Services, Inc.



Stone Oak Centre at Knights Cross

M.S. WALKER
Construction Services, Inc.



Bahamas Medical Center







# WALKER BOOTH GENERAL ENGINEERING, INC.

With over twenty years of experience in the commercial concrete industry and concrete tilt-up structures, Walker Booth General Engineering, Inc. delivers your project in a timely manner with professionalism and expert knowledge on each project.

Our employees play the major role in our success.  The key personnel in the organization have worked together for more than two decades.  We strive to provide a hands on approach to each and every client.  Large or small, each job is given the same amount of care and consideration.

General Engineering

- Demolition
- Clear & Grub
- Grading
- Compaction
- Fine Grading
- Base & Paving

Concrete

- Structural Concrete
- Placement & Finishing
- Foundations
- Tilt Up Structures
- Parking Structures
- On & Off Site Concrete
- Poured In Place Walls
- Inlet & Outlet Structures
- Stamped Concrete
- Sack & Patch













MD Manufacturing





M.S. WALKER
Construction Services, Inc.

# WW STEEL FABRICATION, INC.

Structural Steel Fabrication, & Erection

- Steel Columns
- Wide Flange Beams
- Joist & Deck
- Panelized roofing
- Embeds
- Structural Steel Shop Drawing & Detailing
- Stair systems both straight & curved
- Steel Moment frames, store front frames, & retrofit frames in existing structures for new openings
- Rolled Pieces - Wide Flange, Tube Steel, Channel Iron, Angle Iron & Pipe
- Steel Ledgers
- Reinforcing Bars
- Shop & Field Welding
- Crane Work
- Los Angeles City Approved Fabrication Shop

Miscellaneous

- Hand & Guard Rails from steel or stainless steel.
- Ladders trash gates & bollards
- Trellis Pergola & decorative items
- Pool fences & various decorative fences, & gates












*La Bellasera Hotel & Suites*

# ABOUT OUR PROJECTS

M.S. Walker Construction Services, Inc. has a combined 70+ Years of design, development, management and construction for the industry. The M.S. Walker Staff has led in the construction of over 2000 projects valued in excess of $1 billion including apartments, land developments, hotels, restaurants, industrial facilities, medical facilities, commercial facilities, business parks, professional office parks, schools, jails, municipal centers, and utility projects.

- Assisted Living
- Business Parks
- Hospitality – Hotels
- Hospitality – Restaurants
- Industrial Parks
- Manufacturing Facilities
- Medical Office
- Medical Ambulatory Surgical Centers
- Medical Skilled Nursing Facilities
- Medical Specialty Clinics
- Mini-Storage Facilities
- Multifamily
- Office & Office Parks
- Religious Facilities
- Retail
- Shopping Centers
- Tenant Improvements
- Office
    - Medical
    - Commercial
    - Industrial
    - Retail













Holiday Inn & Suites

# STATES OF OPERATION AND PARTIAL LIST
# OF SATISFIED CLIENTS

## TEXAS - CALIFORNIA - ARIZONA

- Allied Development
- ARB Inc.
- Bell South
- Brown Waits & Armstrong
- Bolthouse Farms
- Buck Owens Productions
- CALVIR Taco, LLC.
- Castle & Cooke Inc.
- Celeron / All American Pipeline
- CenterCal Properties
- City of Bakersfield Public Works
- City of Bakersfield Fire Department
- City of Fillmore
- Chuy's / Baja Broiler
- Clifford Companies
- Clinicas del Camino Real
- Comprehensive Blood & Cancer Center
- Corvette, LLC
- County of Kern
- Crystal Palace
- CW Equities, LLC
- Delano Regional Medical Center
- Del Taco Corporate
- Dole
- Fed-Ex
- Five Star Hospitality
- Food 4 Less / Fleming Foods
- Forum Capital, LLC.
- Golden Empire Transit
- GVH - Bill Sidhu
- Grand Shangrila International
- Hardwood Floor Company
- Hillcrest Mini Storage

- Hillman Fastener
- Hopper Properties
- Housing Authority County of Kern
- Instant Storage
- Interdent, Inc
- Jaco Oil
- Kern Community College District
- Meridian Property Company
- Mobil Oil
- Nestle Inc.
- National Health Services
- NMA Hospitality
- North Bakersfield Recreation & Parks
- OTO Delevopment, LLC.
- Pacific Bell
- Pacific Coast Surgical Centers
- Pacific West Property Services
- Palmentto Hospitaly of Chino Hills
- Panama Buena Vista School District
- Panama 99 Properties
- Panda Palace
- Payless Shoe Source
- Pavia Properties
- Petco
- Pizza Hut / California Pizza LLC
- Pizza Hut / Fugate Enterprises
- Pizza Hut
- RG Sloane
- Santa Maria High School District
- Seabury Lancaster
- Seashore Capital Group, LLC
- Selecta Switch, Inc.
- Shepard Eye Center

- State Farm Insurance
- Star West Enterprises
- Sorensen Medical Group
- South Valley Developers
- Subway
- Southwest Surgical Center
- Supercuts
- Surgical Center of Amador
- Surgical Center of Ahwatukee
- Surgical Center of Casa Grande
- Surgical Center of Davis
- Surgical Center of Folsom
- Surgical Center of El Dorado
- Surgical Center of Grass Valley
- Surgical Center of Pleasanton
- Surgical Center of Porterville
- Surgical Center of Redding
- Surgical Center of Roseville
- Surgical Center of Salinas
- Surgical Center of Simi Valley
- Surgical Center of Tehachapi
- Surgical Center of Tracy
- Surgical Center of Truckee
- The STG Group
- Triangle Surgical Centers
- Texaco
- Victoria Development
- VP Properties
- Wasco Unified School District
- West Hills Community College District
- Yeh Family - Candlewood Suites

## M.S. WALKER
### Construction Services, Inc.

### TEXAS
**300 Beardsley Lane Building D Suite 201 Austin, Texas 78746**
**Phone (512) 794-3800 ~ Fax (512) 794-3801**

### CALIFORNIA
**3551 Pegasus Drive Bakersfield, California 93308**
**Phone (661) 399-3800 ~ Fax (661) 399-5800**
California License #580574

### ARIZONA
**8149 N. 87th Place Suite 108 Scottsdale, Arizona 85258**
**Phone (480) 946-6100 ~ Fax (480) 946-6101**
Arizona License #166479

**INFO@MSWALKERINC.COM | WWW.MSWALKERINC.COM | 1-866-MSWALKER (679-2553)**

## M.S. WALKER
*Construction Services, Inc.*

### General Construction | Construction Management

**TEXAS**

300 Beardsley Lane Building D Suite 201 Austin, Texas 78746
Phone (512) 794-3800 ~ Fax (512) 794-3801

**CALIFORNIA**

3551 Pegasus Drive Bakersfield, California 93308
Phone (661) 399-3800 ~ Fax (661) 399-5800
California License #580574

**ARIZONA**

8149 N. 87th Place Suite 108 Scottsdale, Arizona 85258
Phone (480) 946-6100 ~ Fax (480) 946-6101
Arizona License #166479

INFO@MSWALKERINC.COM | WWW.MSWALKERINC.COM | 1-866-MSWALKER (679-2553)

# FLOYD HUNTLEY

M.S. Walker Construction Services, Inc.

Project Manager

## SUMMARY

Mr. Huntley has over 20 years experience in Construction, Project, and Facilities Management. He has worked with Los Angeles City Council to promote city wide neighborhood improvement programs.

Mr. Huntley has a good working knowledge of City Governments. He has a proven ability to restructure stalled projects, while utilizing existing budgets to complete Certificate of Occupancy. His communication and organizational skills are strong with the ability to accurately multi-task. He possesses excellent customer service and troubleshooting skills.

## SELECTED PROJECTS

Construction of four story 110 unit Hampton Inn and Suites Hotel, with a budget of 16 million dollars. Worked with San Manuel Band of Indians, and their Development Company to maintain budget, Hilton Construction Standards and schedule. Received High score of 80% on Quality Control pre-Opening Hilton check list. Worked with Contract Administrator developing contract documents and purchase orders.

Construction of 100 unit Condominium project with a budget of 18 million dollars.  Worked with team to identify and recommend corrections of architectural and structural design issues. Developed new contracts, and negotiated existing contract issues with subcontractors, to keep project running. Worked with City Government to resolve existing Entitlement issues to keep project from being closed down. Developed construction schedule

Construction of 10 million dollar, 25 unit luxury apartment complex.  Successfully reorganized stalled project while developing new construction schedule and budget. Worked closely with the City of Palm Springs in obtaining permits and certificates of occupancy. Worked with architect in resolving design issues.  Developed new contracts and business relationships

Corporate Services for City National Bank/Pacific National Bank.  Responsible for projects that included but not limited to: Move Management of City National Bank departments, new construction, tenant improvements/ branch remodels, security upgrades, facilities maintenance, AB244 ATM upgrades/retrofits, and all I.S. projects. Approximately 200 total projects completed. Received awards for outstanding performance

Successfully completed three large multi tenant/residential property renovations with a combined budget of approximately 10 million dollars.  Managed re-roofing, and HVAC retrofitting of over 500 units.  Worked with seismic inspectors/engineers in restructure of earthquake damaged buildings in LA.  Worked with Architects and planning department in design and construction of residential common area recreational facilities.

Facilities/Construction Manager for commercial and industrial properties. Coordinated and completed multiple tenant improvements, ranging from small multi-tenant business parks to large distribution warehouses

Facility/Construction Manager and hands on maintenance for three large class "A" residential properties.