CYNTHIA FUTTER (SBN #114096)
ANNE E. WELLS (SBN #155975)
FUTTER-WELLS, PC
2463 Ashland Avenue
Santa Monica, CA 90405
Telephone: (310) 450-6857
Facsimile: (888) 900-9077

Attorneys for Chapter 11
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO DIVISION

| | |
|---|---|
| In re<br><br>Carbon Beach Partners, LLC, a Delaware limited liability company,<br><br><br>Debtor and Debtor in Possession. | Bk. No. 1:09-24657-GM<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING DEBTOR IN POSSESSION TO INCUR POST PETITION FINANCING PURSUANT TO BANKRUPTCY CODE §364(d)(1) IN CONJUNCTION WITH CONFIRMATION OF PLAN OF REORGANIZATION (DECLARATIONS OF MICHAEL KEST, CYNTHIA FUTTER, JOHN SCHMENDIG, MARK ROSS, AND MICHAEL KOOK FILED HEREWITH)**<br><br>**Plan Confirmation Hearing**<br><br>Date: October 1, 2010<br>Time: 10:00 AM<br>Ctrm: Courtroom 303<br>     21041 Burbank Boulevard<br>     Woodland Hills, CA 91367 |

Please take notice that a hearing will be held on October 1, 2010 at 10:00 am, in the above referenced courtroom, on the motion of Carbon Beach Partners, LLC, the Debtor and Debtor in Possession herein (the "Debtor") for an order authorizing the incurrence of financing, *senior to any existing liens or encumbrances,* pursuant to Bankruptcy Code §364(d)(1). *This motio*n seeks authority for the Debtor to borrow up to $3,500,000, with said funds to be used by the Debtor to complete construction of the Debtor's primary asset, an 8 unit luxury condominium located in Malibu, California (the "Property"). The Motion is filed in connection with the confirmation of the Debtor's plan of reorganization, set for hearing at the same time as the Motion.

This motion is based on this Notice, the accompanying memorandum of points and authorities, the declarations of Michael Kest, Cynthia Futter, Mark Ross, John Schmendig, and Michael Kook filed herewith, and such other evidence as the Debtor may present at or prior to the hearing hereon.

Pursuant to Local Bankruptcy Rule 3017-1, any objections to the Motion must be filed with the Court and served on counsel for the Debtor by no later than September 17, 2010 and any reply of the Debtor may be filed no later than September 24, 2010. The failure to file any objection to the Motion may be deemed to be a waiver of any such objection and consent to the Court's approval of the Motion.

Dated: September 10, 2010                             Carbon Beach Partners, LLC

                                                      By:____*/s/Cynthia Futter*_____
                                                           Cynthia Futter (SBN 114096)
                                                           FUTTER-WELLS, PC
                                                           2463 Ashland Avenue
                                                           Santa Monica, CA 90405
                                                           Telephone:  (310) 450-6857
                                                           Facsimile:  (888) 900-9077

                                                           Attorneys for Chapter 11
                                                           Debtor and Debtor in Possession

**Motion for Order Authorizing Debtor to Incur Post-Petition Financing**
**Pursuant to Bankruptcy Code §364(d) (1) In Connection**
**with Confirmation of Plan of Reorganization**

The Debtor and Debtor in Possession herein, Carbon Beach Partners, LLC (the "Debtor") hereby moves the Court for an order authorizing it to incur post-petition financing pursuant to Bankruptcy Code §364(d)(1)("Section 364") and in connection with confirmation of the Debtor's Plan of Reorganization (the "Plan"). This Motion is contingent on the entry of an order by the Court confirming the Plan, and should such order not be entered, the Debtor will withdraw this Motion.

**BACKGROUND**

**A. Description and History of the Debtor's Business.**

As outlined in the court approved disclosure statement, the Debtor owns land and the improvements thereon, consisting of an 8 unit, luxury condominium complex consisting of approximately 41,000 square feet, in Malibu, California (the "Property"). In order to develop the Property, the Debtor borrowed development funds from Builders Bank (the "Bank"). The Debtor gave the Bank a promissory note for said funds and provided to the Bank a mortgage on the Property to secure the repayment of the Bank note. Due to a series of entitlement and other City of Malibu delays in permitting the building of the project, the term and amount of the Bank debt was extended several times. See Declaration of Michael Kest, filed herewith, at 2 (the "Kest Decl.").

By the end of 2008, the Property was approximately 95% completed. However, the Debtor and the Bank were unable to come to terms on a restructuring of the Bank debt. The Bank sued the Debtor and sought the appointment of a receiver (the "Receiver") to complete construction of the Property so that it could be sold and the Bank paid off. The Bank and the Debtor reached an agreement as to the disposition of proceeds upon the sale of the Property once completed by the Receiver. In the meantime, a number of subcontractors and the general contractor filed a series of mechanic's liens against the Property, and a series of lawsuits were then filed contesting both the validity and priority of these mechanics' liens vis-à-vis the liens of the Bank.

Unfortunately, the Receiver was unable to complete construction of the Property and more than a year passed. In the meantime, the Receiver was signing contracts and incurring debt, most of which did not seem to move the Property toward completion. Finally, in late 2009, the Bank informed the Receiver that it was no longer willing or able to fund the receivership and the Receiver and the Bank ended up in a dispute over certain of the expenses incurred by the Receiver.

When this dispute erupted between the Receiver and the Bank, and critical insurance was allowed to lapse, the Debtor filed this case.

### B. Claims Asserted in this Case.

The majority of claims in this case stem from the construction of the Property. Kest Decl., at 3. Unfortunately, as alleged in the litigation between the Debtor and the Bank, the Bank agreed to compromise these claims and the Debtor believes that not only have some of them been compromised, but many were either filed incorrectly or are subject to offset for holdbacks or other rights of the Debtor. Most of these claims will have been objected to prior to the haring on this Motion.

Builders has filed a claim in the amount of approximately $17.8 million, although this is more than $4 million ***more*** than the principal advanced by the Bank to the Debtor. Of this, there is almost $1 million in default interest, more than $670,000 in late fees, another $220,000 or so in legal fees (for an uncontested receivership) and another $1.3 million in receivership expenses, many of which the Debtor believes were not incurred consistent with orders appointing the Receiver or approving receiver's certificates. ALL OF THESE ARE THE SUBJECT OF THE LITIGATION BETWEEN THE BANK AND THE DEBTOR AND THE RECEIVER. With the Bank's principal and note interest, according to the Bank's claim, the Bank is owed approximately $14.5 million. See Proof of Claim filed by the Bank (Claims Docket # 10).

In addition, there are the following lien claimants who have filed liens claims against the Property and are the only known even potentially secured creditors of this estate, most of which are objectionable or invalid as liens on the Property according to the analysis of the Bank and the Debtor:

| Secured Claims | Amount | Proof of Claim Filed |
|---|---|---|
| Cell-Crete Corp. | $20,761 | yes |
| Signature Interiors | $237,284.39 | yes |
| DRI Commercial Corporation | $10,758[1] | yes |
| All Pro Framing, Inc. | $44,333.39 | yes |
| TJS Enterprises, Inc. | $28,271.87[2] | yes |
| JYG Concrete | $57,224.56 | yes |
| Wall Design | $352, 280 | No |
| Southcoast Cabinet | $132,384[3] | No |
| Dynamic Plumbing | $118,559 | No |
| IZ Construction | $249,843[4] | No |
| Karcher Interior | $2025[5] | No |
| M Maintenance | $10,395[6] | No |
| Tazz Lighting | $26,295[7] | No |
| C&S Pipeline | $61,829[8] | No |

---

[1] Determined by Bank to be invalid liens due to defective notice (no record of notice) and a lien release has been given but not recorded. Kest Declaration, at 3.

[2] Determined by Bank to be invalid lien due to defective notice (no record of notice). Kest Declaration, at 3.

[3] According to the Bank's analysis, this lien is invalid since the contractor failed to timely file suit to foreclose. Kest Declaration, at 3.

[4] According to Bank and Debtor's analysis, this lien is defective since work was not adequately described in notice and claim is only $125,992. Kest Declaration, at 3.

[5] According to Bank and Debtor's analysis, no complaint was filed and this invalidates the lien. Kest Declaration, at 3.

[6] According to Bank and Debtor's analysis, this lien is invalid since it was filed in the wrong county. Kest Declaration, at 3.

[7] This lien is believed to be invalid since date of cessation of work is suspect and notice inaccurately listed contractor. Kest Declaration, at 3.

[8] According to the Bank and Debtor's analysis, no notice was served on bank and therefore lien is invalid. Kest Declaration, at 3.

| JA Hill | $1,436,698[9] | No |

All told, the Debtor believes that the liens filed against the Property that will be deemed to be secured (but the amount and priority are subject to dispute) total no more than $801,489. Kest Decl., at 4. The Debtor does not concede the extent, priority or validity of these liens.

### C. The Plan of Reorganization Filed by the Debtor.

Because of the damage done to the Property by the Bank and the Receiver in terms of deconstruction and redesign, as well as other factors, once this case was filed, the Debtor, now back in control of the Property, began to consider confirmation possibilities. The entire reason this case was filed was because the Bank failed to do what it promised to do: fund the completion of the Property so all the creditors could be paid. Obviously, the Property needs to be completed and the Bank has no ability to fund completion of construction of the Property. In fact, the Bank is operating under a Consent Decree for its operating practices and its lack of capital. See Kest Decl., Exhibit A. Therefore, the Debtor looked for other financing alternatives for the Property.

The Plan provides that a new lender will advance funds to the Debtor to complete construction pursuant to a budget, and the Property will be completed and sold over an 18 month period. The net proceeds of sale will be used to pay of this new lender and then will be disbursed to the creditors who are determined by this Court to be next in the absolute order of priority. Obviously, given the litigation between the Debtor and the Bank and the Receiver, and the objections to the claims of the mechanics' lien holders, it will be months before the extent and priority of liens are determined. During that time, the holders of allowed secured claims will receive monthly payments and the Property will be finished and marketed for sale.

---

[9] The Debtor and the Bank both believe this claim is duplicative of subcontractor claims filed against the Debtor. Kest Declaration, at 3.

**D. This Motion and the DIP Financing.**

This Motion is filed in conjunction with the Debtor's Plan in order to procure the financing needed to consummate the Plan and complete construction of the Property.

## ARGUMENT

**A. The Applicable Legal Standard.**

Under Section 364 of the Bankruptcy Code, this Court may approve debtor in possession financing *secured by a senior lien on property of the estate* if: the debtor cannot obtain such credit otherwise, and any the interests of any other lien holders are adequately protected. Bankruptcy Code §364(d) (1).

**B. The Terms of the Proposed Financing.**

As indicated in the Plan and court approved disclosure statement therefor, the amount of the new loan will be up to $3,500,000, payable in full, along with the principal in 18 months. There are no monthly payment requirements, even though the current secured creditors under the Plan will be paid monthly interest payments on their claims from the proceeds of this new loan (the "New Loan"). There is a 3% late fee and default interest at 5% on any amount not paid when due. For each of the Class 1 claimants, the terms are the same except for the interest rates. Copies of the proposed loan documents for this loan are attached to the Futter Declaration, filed herewith, as Exhibits A to C. The funds can only be disbursed pursuant to a budget, which was attached to the disclosure statement and is attached to the Futter Declaration as Exhibit D. ***This financing and the liens granted in connection therewith will be senior to all existing pre-petition liens.***

The Debtor believes that this represents market terms for a loan of this nature. Prior to the bankruptcy, when the Bank refused to further fund the Receiver, the Receiver filed an application to have third party lenders fund the Property and the Receiver on terms either similar to or less favorable than these terms. See Kest Decl., at 5-7; Declaration of Mark Ross, filed herewith. This new lender has

completed its diligence and is ready to fund if the Court approves this Motion. See Declaration of John Schmendig, filed herewith.

### C. Priming Financing is Appropriate in this Case.

#### 1. There is No Other Lender Available to Fund Completion of the Project.

As discussed in the Declarations of Michael Kest and Mark Ross, filed herewith, the Debtor is unable to obtain any financing for the Property other than on a "priming" basis. The reasons for this are clear:

a. The Property was subject to the control of the Bank for almost 18 months and it was left in a partially deconstructed, demolished state, thus making its completion more difficult and uncertain than other deals available to those lenders;

b. There is very little DIP financing available in today's market as lenders struggle with the value of partially completed projects and where the market for any finished product is leading;

c. The Property was abandoned in this state by the Receiver when the Bank reneged on its promises to the Receiver and the Debtor to fund the completion of construction and it is unclear until construction starts again the exact extent of the damage done by the Bank during its tenure and this is a risk a new lender does not necessarily want to take;

d. The amount and extent of liens against the Property is unknown as various mechanics' lien holders have filed claims and the amount ,extent and priority of said claims is not only unknown, but is subject to litigation in the state court between the Bank and various of said claimants;

e. In this market, the actual time to market the Property is less certain and therefore less attractive to a traditional commercial lender;

f. The Debtor is unable to make any payments on the loan until such time as the Property is completed and marketed; and

g. The extent and cost of insurance for any construction defects is unknown because the Bank let the previous defects insurance lapse during the Receivership and this effects the desirability of the Property as collateral for any traditional commercial lender;

8

Since the Proposed Lender is an affiliate of the Debtor's manager, the Proposed Lender is more comfortable with these risks because:

a. The Manager has been involved with the construction of the Property before the Receivership and has a level of comfort with the physical structure of the Property;

b. The Manager and the Proposed Lender have another affiliate, which has purchased properties out of foreclosure or chapter 11, including one developed by the former developer of this Property, and has a level of comfort with the ability of the former developer to work with the proposed lender to complete the Property;

c. The proposed lender does not need current payments and has no shareholder or independent market forces to satisfy in terms of current returns;

d. The lender and its affiliates have worked extensively with the proposed general contractor for the Debtor and know that this general contractor can both take over a troubled project and complete it leaving only market risk instead of builder risk and market risk.

See Kest Decl., at 5-7. The only other sources found by the Debtor were not as favorable as those offered by this new lender. See Declaration of Mark Ross, filed herewith; Kest Decl., at 6.

**2. The Bank is Unable to Finance the Completion of Construction of the Property.**

Nor is this a case where the Bank can simply offer that it will finance the completion of construction of the Property. Initially, this case was necessitated by the failure of the Bank to honor its promises to BOTH the Debtor and the Receiver that it would fund the ongoing redesign and construction of the Property. Second, the Bank is operating under a consent order for its banking practices and its lack of required capital to protect its depositors. See Kest Decl., Exhibit A.

**3. Lien Holders Asserting Liens on the Property are Adequately Protected.**

The various kinds of statutory adequate protection are outlined in Bankruptcy Code § 361. These include periodic payments, an equity cushion or the "indubitable equivalent." *Id.*

In this case, the Debtor expects all the mechanics' lien holders to consent to the terms of the financing with the Proposed Lender since, without the completion of the Property and the sale of the units to third

party buyers, their claims have virtually no hope of being paid in the foreseeable future. The Debtor expects the Bank, as part of its ongoing litigation strategy, to object to anyone finishing construction of the Property.

   a. **This Court Cannot Yet Adequately Consider These Issues Prior to a Determination of Value of the Property and the Extent, Validity and Priority of the Bank's Claim**.

The question of adequate protection is complicated in this case as the priority, amount and extent of the Bank's lien and the various mechanics' liens is in dispute. In addition, the Debtor has asked this Court to equitably subordinate some or all of the Bank's claim to the mechanic's lien creditors who may now be behind a lot more debt because of the debt incurred by the Bank with respect to the Receivership, funds that were not spent in any way in furtherance of the Receivership or the tasks for which the Receiver was appointed and given authorization. As outlined in the Motion to Bifurcate Confirmation Hearing, filed herewith, the Debtor believes that the Court must FIRST determine: (a) the extent, priority and validity of the Bank's claim (including any offsets or reductions related to the Bank's pre-bankruptcy conduct); and (b) the value of the Property both as of the Petition Date, including any reduction in value due to the demolition and deconstruction by the Bank, and the value as of completion of the Property.

However, using the amount of the Bank's principal and note interest ($14.5 million) and the anticipated maximum amount of lien claims (approximately $805,000), there is enough equity in the Property as of today to incur the new financing and all junior creditors will be fully secured. Unfortunately, the full amount of these claims under Bankruptcy Code §506(b) cannot be determined until such time as the claims are allowed under Bankruptcy Code §506(a). A bankruptcy court undertakes the determination of secured status in conjunction with the confirmation hearing on the proposed bankruptcy plan, but only as to claims which have already been deemed allowed. See, *e.g.*, I*n re Hartford*, 7 B.R. 914, 916 n. 7 (D. Maine 1981) (Section 506 valuation occurs in conjunction with confirmation hearing after Section 502 claim allowance); *In re Hotel Associates, Inc.*, 3 B.R. 340, 341-42 (E.D.Pa.1980) (claim must be allowed under Section 502 before its secured status can be determined under Sec. 506). Until such time as the Bank and these other lien holders' claims are allowed under

Section 506(a), it is impossible to calculate the full amount of their secured claims. This is why the Debtor has filed its Motion to Bifurcate Confirmation Hearing.

### b. The Bank is Fully Secured.

As indicated, the extent, validity and priority of the Bank's claim is disputed in the ongoing litigation between the Bank and the Debtor. It is undisputed that the Bank advanced to the Debtor the principal sum of approximately $13 million. Kest Decl., at 8. The Bank has filed a claim for some $17 million, which includes a lot of receivership expenses that the Debtor has alleged are inappropriate. It also includes legal expenses and other items incurred in connection with the pre-bankruptcy activities of the Bank with the Receiver, all of which are alleged to have prejudiced and damaged the Debtor. Regardless of the amount of its alleged claim, the Bank claims that it is first in priority on the Property.

In any event, the Debtor believes that the Bank is fully secured for at least its principal and pre-bankruptcy interest. When the Receiver was appointed in October of 2008, the Receiver received valuation evidence for the Property in its THEN CURRENT state; that is, before the Bank started tearing down walls, removing cabinets, taking out stairwells and the other things the Bank did. The Receiver reported on his findings that the Property was worth $24 million, saying:

> Immediately after taking control of the property, the Receiver solicited a Broker Price Opinion of the project from Coldwell Banker & Associates, the local broker listing the units for sale. The real estate agent is a member of the International Presidents Circle and Previews Property Specialist for Coldwell Banker in Malibu and stated that the units had been offered since May 2008 at prices ranging from $3.2 Million to $3.6 Million. The agent added that although prices of real estate in the California and Malibu market areas have softened in recent months, she had received offers on two units at $3 Million and $3.2 Million…. The agent provided an opinion of value for the units at a price range of 2.8 to 3.2 Million (Total Value of $24 Million) but cautioned that the value could be lower in early 2009 when the remaining units are completed, if market conditions deteriorate from the present levels or if the mortgage and banking crisis worsens.
>
> On October 20 and 22, 2008, the Receiver inspected several Malibu condominium projects, including two units that were listed in the appraisal as comparables. The most direct comparable, in the opinion of the broker, is Unit #19 in the Toscana Project on DeVille Way in the City of Malibu CA. This condominium complex, completed in 2005, consists of 22 units in the Malibu Civic Center area. The units, especially Unit #19 feature ocean and mountain views, custom upgrades, and Viking Appliances, similar to the

> subject project at Carbon Beach.  Negative features are size (2,700 square feet versus 3,198 square feet), amenities, proximity to the beach and the prestige of Carbon Beach compared with the Malibu Colony and Civic Center area.
>
> The square foot asking price of the comparable unit was $957; which has since been reduced to $810. The original asking price would imply a value of $3.1 Million (unadjusted) for each unit; the lowered asking price per square foot would imply a price of $2.6 Million for each unit.  These implied prices do not reflect adjustments for location or amenities (such as elevators) for the subject project.  In the opinion of the broker, the project location and amenities would justify a higher average price than the comparable.

See Kest Decl., Exhibit B.

After the Receiver and Bank had been in control for another year, the Bank provided its own valuation evidence of the Property to the Debtor.  As late as September 2009, the month this case was filed, the Bank reported to the Debtor that its valuation of the Property was holding at very high numbers and certainly enough for the Bank to be fully secured.  This report is attached to the disclosure statement and the Kest Declaration and has an "as-is" value of the Property right before the bankruptcy at $ $19,990,000. This analysis was prepared for the Bank by Pritchett-Rapt on liquidation, quick sale basis, with the assumption that no further capital would be provided to complete construction of the Property. Kest Decl., Exhibit C.  Not only does this show how much value the Property held, but the entire discussion of the various options which THE BANK could chose to finish the construction is outlined in great detail, showing the extent to which THE BANK was in total and complete control of the Property right before the bankruptcy was filed.

The value of the Property continues to hold solid today even in this market.  According to valuation evidence procured by the Debtor, and the Declaration of Michael Kook filed herewith, the Bank is fully secured at least to the extent of its principal and pre-petition interest.[10]  As indicated in the Declaration of Michael Kook, filed herewith, the liquidation value of the Property **<u>as of today</u>** is estimated to be at least $21,050,000 and, once completed, will be worth more. This is entirely consistent

---

[10] As indicated, this is before any offsets to the Bank's claim resulting from the pending litigation and the Debtor disputes the extent, priority and validity of the Bank's filed claim.

with the valuation evidence submitted by the Bank to the Debtor immediately prior to the filing of this bankruptcy case.

Nor is there any reason to believe that the Property is declining in value. It has been in lockdown since the bankruptcy case was filed and there has been no vandalism or any other deterioration of the Property since the case was filed. See Kest Decl., at 11. In addition, given that the loan proceeds will only be used consistent with a budget approved by the Court and on completing construction of the Property, the Property will only increase in value as it is completed and made ready for sale to third party buyers. In fact, according to the valuation evidence obtained by the Bank prior to the bankruptcy and the current valuation opinions obtained by the Debtor, as well as the opinion of the Receiver, the Property will only increase in value with the completion of construction. See Declaration of Michael Kook; Kest Decl., Exhibits B and C.

Moreover, this situation is unique in that the Property will be increasing in value as it is completed and this value, under the Debtor's plan, inures to the benefit of all secured creditors as they receive 100% of the proceeds of sale of the Property before unsecured creditors or equity holders receive anything. See *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (S.D.N.Y. 1992) (junior lien holder adequately protected by increase in value resulting from improvements to property effectuated by post-petition financing). Thus, the completion of the Property itself is an element of adequate protection recognized by courts.

Thus, the Debtor believes that the Bank is adequately protected and that completion of the Property will only further increase that protection and the ability of the Debtor to repay the Bank once the full extent, validity and priority of its claim is determined by this Court.

c. **The Bank is Further Adequately Protected by Periodic Payments Under the Plan of Reorganization.**

In addition, one of the statutory forms of adequate protection is the use of periodic payments to cover any decrease in the value of the Property during the term of the priming loan. Bankruptcy Code §361(1). In this case, as provided in the budget, the Bank will be paid, under a reservation of rights if its

13

claim has not been allowed, periodic payments equal to 6% interest on the amount of its claim. Again, as indicated in the Application to Continue and Bifurcate adequately protect Confirmation Hearing, until such time as the amount of the Bank's claim is actually determined and all offsets are applied (including any restriction on post-petition interest or fees), it is impossible to determine how much these payments will be.

Nonetheless, period payments are NOT designed to protect a secured creditor against accruing interest. Periodic payments are designed to protect a secured creditor from any DECREASE in the value of the Bank's secured interest. See 3 *Collier on Bankruptcy* ¶ 361.03[1] (15th ed. Rev. 2006) ("Section 361 only addresses a decrease in value of the entity's interest in the property. Therefore, if the equity cushion has been eroded by the accumulation of post-petition interest rather than a decrease in the value of the collateral, the creditor should not be entitled to adequate protection"). Therefore, since there is no evidence that the Property will be decreasing in value, and in fact, the only credible evidence will be that the Property will actually be increasing in value as it is completed, the 6% payments, even on the Bank's principal alone, will protect the Bank against any decrease in the value of the Property going forward. See *In re Weinstein*, 227 B.R. 284 (BAP 9th Cir. 1998); 3 *Collier on Bankruptcy* ¶ 361.03[2] (15th ed. Rev. 2006) ("[Periodic payments] are intended to protect the affected entity against a decrease in the value of the property, which would directly affect the entity's interest in the property"). Section 361 only addresses a decrease in value of the entity's interest in the property. Therefore, if the equity cushion has been eroded by the accumulation of post-petition interest rather than a decrease in the value of the collateral, the creditor should not be entitled to adequate protection").

### d. Any Other Secured Creditors are Also Adequately Protected.

The Debtor believes the same analysis applies to the other asserted secured claims. The claims of the County of Los Angeles will be paid in full at confirmation from the proceeds of the new loan. The other allowed secured claims, once they are allowed, will be paid periodic payments of 5% of their allowed claims during the 18 month term of the new loan. While it is impossible at this point to determine their priority or extent, the Debtor believes that they are adequately protected by both the payments to them and the increase in the value of the Property as the construction is completed. This is particularly true is they are deemed to be undersecured as adequate protection payments are applied to the

Case 1:09-bk-24657-GM    Doc 76    Filed 09/10/10    Entered 09/10/10 17:32:48    Desc
Main Document    Page 15 of 15

secured portion of the claim.  See *In re Marquez*, 270 B.R. 761 (Bankr. D. Az. 2001) (adequate protection payments are applied to secured portion of claim, not unsecured portion).

## CONCLUSION

For each of the above reasons, the Debtor asks that this Court enter an order authorizing it to incur the financing described herein and in the loan documents attached to the Futter Declaration as Exhibits A to C.

Dated: September 10, 2010     Carbon Beach Partners, LLC,
a California limited liability company


By: _____/S/ *Cynthia Futter*_____
CYNTHIA FUTTER
FUTTER-WELLS, P.C.
Attorneys for Chapter 11 Debtor
and Debtor in Possession