Cynthia Futter (SBN 114096)
Anne E. Wells (SBN 155975)
Futter-Wells, P.C.
2463 Ashland Avenue
Santa Monica, CA 90405
Phone: 310-450-6857
Fax: 888-900-9077
Proposed Counsel for Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO DIVISION

|  |  |
|---|---|
| In re:<br><br>Carbon Beach Partners, LLC, a Delaware Limited Liability Company,<br><br>          Debtor in Possession. | Case No.: 09-24657-GM<br><br>**DECLARATION OF MICHAEL KEST IN SUPPORT OF CONFIRMATION OF PLAN OF REORGANIZATION AND DIP FINANCING**<br><br>**Date: October 1, 2010**<br>**Time: 10:00 AM**<br>**Place: Courtroom 303** |

I, Michael Kest, do hereby declare:

1. I am the President of Jordinia Operations, Inc., the manager of the Debtor and Debtor in Possession herein (the "Debtor").

2. The Debtor owns land and the improvements thereon, consisting of an 8 unit, luxury condominium complex consisting of approximately 41,000 square feet, in Malibu, California (the "Property"). In order to develop the Property, the Debtor borrowed development funds from Builders Bank (the "Bank"). In late 2009, the state court appointed receiver (the "Receiver") and the Bank ended up in a dispute over certain of the expenses incurred by the Receiver. When this dispute erupted

between the Receiver and the Bank, and critical insurance was allowed to lapse, the Debtor filed this case.

3.   The majority of claims in this case stem from the construction of the Property. The Bank has filed a claim in the amount of approximately $17.8 million.  In addition, there are a number of lien claimants that have filed claims against the Debtor.  One of the things the Bank agreed to do as part of the joint venture with the Debtor was to resolve these mechanics lien claims.  The Bank provided to the Debtor though counsel its ongoing analysis of these claims, including which were filed correctly or not, which had appropriate notices or not, which were in the correct amount or not, which contained stop notices or not, and other similar information. The results of this analysis are footnoted by each claim.  Based on this analysis and the Debtor's own review of many of these issues, the liens that were filed are as follows:

| Secured Claims | Amount | Proof of Claim Filed |
| --- | --- | --- |
| Cell-Crete Corp. | $20,761 | yes |
| Signature Interiors | $237,284.39 | yes |
| DRI Commercial Corporation | $10,758[1] | yes |
| All Pro Framing, Inc. | $44,333.39 | yes |
| TJS Enterprises, Inc. | $28,271.87[2] | yes |
| JYG Concrete | $57,224.56 | yes |
| Wall Design | $352, 280 | No |
| Southcoast Cabinet | $132,384[3] | No |

---

[1]Determined by Bank to be invalid liens due to defective notice (no record of notice) and a lien release has been given but not recorded.
[2] Determined by Bank to be invalid lien due to defective notice (no record of notice).

2

| Dynamic Plumbing | $118,559 | No |
|---|---|---|
| IZ Construction | $249,843[4] | No |
| Karcher Interior | $2025[5] | No |
| M Maintenance | $10,395[6] | No |
| Tazz Lighting | $26,295[7] | No |
| C&S Pipeline | $61,829[8] | No |
| JA Hill | $1,436,698[9] | No |

4. All told, the Debtor believes that the liens filed against the Property that will be deemed to be secured (but the amount and priority are subject to dispute) total no more than $801,489. The Debtor does not concede the extent, priority or validity of these liens.

5. Once this case was filed, the Debtor, now back in control of the Property, began to consider confirmation possibilities. The entire reason this case was filed was because the Bank failed to do what it promised to do: fund the completion of the Property so all the creditors could be paid. The Property needs to be completed and the Bank has no ability to fund completion of construction of the Property. In fact, the Bank is operating under a Consent Decree for its operating practices and

---

[3] According to the Bank's analysis, this lien is invalid since the contractor failed to timely file suit to foreclose.

[4] According to Bank and Debtor's analysis, this lien is defective since work was not adequately described in notice and claim is only $125,992.

[5] According to Bank and Debtor's analysis, no complaint was filed and this invalidates the lien.

[6] According to Bank and Debtor's analysis, this lien is invalid since it was filed in the wrong county.

[7] This lien is believed to be invalid since date of cessation of work is suspect and notice inaccurately listed contractor.

[8] According to the Bank and Debtor's analysis, no notice was served on bank and therefore lien is invalid.

[9] The Debtor and the Bank both believe this claim is duplicative of subcontractor claims filed against the Debtor.

its lack of capital. A true and correct copy of the Consent Decree is attached hereto as Exhibit A. I personally participated in discussions with Mitch Saywitch, the CEO of the Bank, regarding the lack of funding the Bank had for the Property. Therefore, the Debtor looked for other financing alternatives for the Property.

6.  Prior to the bankruptcy, when the Bank refused to further fund the Receiver, the Receiver filed an application to have third party lenders fund the Property and the Receiver on terms either similar to or less favorable than the terms being offered by the new lender, Active Mortgage Company.   In addition, the Debtor, working with loan brokers and others, has attempted to find more favorable funding and has been unable to do so. I believe this is because, among other things:

   a.  The Property was subject to the control of the Bank for almost 18 months and it was left in a partially deconstructed, demolished state, thus making its completion more difficult and uncertain than other available deals for lenders;

   b.  There is very little DIP financing available in today's market as lenders struggle with the value of partially completed projects and where the market for any finished product is leading;

   c.  The Property was abandoned in this state by the Receiver when the Bank reneged on its promises to the Receiver and the Debtor to fund the completion of construction and it is unclear until construction starts again the exact extent of the damage done by the Bank during its tenure; this is risk a new lender does not necessarily want to take;

d.  The amount and extent of liens against the Property is unknown as various mechanics' lien holders have filed claims and the amount ,extent and priority of said claims is not only unknown, but is subject to litigation in the state court between the Bank and various of said claimants;

e.  In this market, the actual time to market the Property is less certain and therefore less attractive to a traditional commercial lender faced with many lending options;

f.  The Debtor is unable to make any payments on the loan until such time as the Property is completed and marketed; and

g.  The extent and cost of insurance for any construction defects is unknown because the Bank let the previous defects insurance lapse during the Receivership and this effects the desirability of the Property as collateral for any traditional commercial lender;

7.  Since Active, the proposed lender, is affiliated with the Debtor's manager, the Proposed Lender is more comfortable with these risks because, among other things:

a.  I have been involved with the construction of the Property before the Receivership and has a level of comfort with the physical structure of the Property;

b.  Active has another affiliate, which has purchased properties out of foreclosure or chapter 11, including one developed by the former developer of this Property, and has a level of comfort with the ability of the former developer to work with Active to complete the Property;

    c. Active does not need current payments and has no shareholder or independent market forces to satisfy in terms of current returns;

    d. Active and its affiliates have worked extensively with the proposed general contractor for the Debtor and know that this general contractor can both take over a troubled project and complete it leaving only market risk instead of builder risk and market risk; and

    e. Because of its affiliates, it has a business interest in seeing construction of the Property completed.

8. It is undisputed that the Bank advanced to the Debtor the principal sum of approximately $13 million.

9. In late 2008, after the Receiver took control of the Property, he filed a report in the state court which appointed him. A true and correct copy of that report is attached hereto as Exhibit B. Therein, he estimated the Property to be worth at least $24 million based on a broker opinion provided to him.

10. After the Receiver and Bank had been in control for another year, in September 2009, as I was telling the Bank that significant expenses would not result in significant increases in the overall value of the Property, the Bank provided to me, via counsel, its own valuation evidence of the Property at that time. As late as September 2009, the month this case was filed, the Bank reported to the Debtor that its valuation of the Property was holding at very high numbers and certainly enough for the Bank to be fully secured. This report is attached hereto as Exhibit C and shows an "as-is" value of the Property right before the bankruptcy at $19,990,000. This analysis was prepared for the Bank by Pritchett-Rapt on

liquidation, quick sale basis, with the assumption that no further capital would be provided to complete construction of the Property.

11. The Property has been in lockdown since the bankruptcy case was filed and there has been no vandalism or any other deterioration of the Property since the case was filed.

12. In addition, since the proceeds of the new loan will only be used consistent with a budget approved by the Court and for completion of the Property, I believe the Property will only increase in value as it is completed and made ready for sale to third party buyers.

Executed on this 10th day of September 2010 at Culver City, California.


                                        /s/ Michael Kest

                                        MICHAEL KEST, Declarant

**Exhibit A**
**Consent Decree**

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

AND

STATE OF ILLINOIS

DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION

DIVISION OF BANKING

SPRINGFIELD, ILLINOIS

| | |
|---|---|
| In the Matter of | |
| | CONSENT ORDER |
| BUILDERS BANK | |
| CHICAGO, ILLINOIS | FDIC-09-617b |
| | 2010-DB-04 |
| (ILLINOIS CHARTERED | |
| INSURED NONMEMBER BANK) | |

Builders Bank, Chicago, Illinois ("**Bank**"), having been
advised of its right to a NOTICE OF CHARGES AND OF HEARING
detailing the unsafe or unsound banking practices alleged to
have been committed by the Bank, and of its right to a hearing
on the charges under section 8(b) of the Federal Deposit
Insurance Act ("**Act**"), 12 U.S.C. § 1818(b), and under  38 Ill.
Adm. Code, § 392 et seq., regarding hearings before the Illinois
Department of Financial and Professional Regulation, Division of
Banking, ("**Division**"), and having waived those rights, entered
into a STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT
ORDER  ("**STIPULATION**") with representatives of  the Federal

Deposit Insurance Corporation ("**FDIC**") and the Division dated

May 18, 2010, whereby, solely for the purpose of this proceeding

and without admitting or denying the charges of unsafe or

unsound banking practices, the Bank consented to the issuance of

a CONSENT ORDER ("**ORDER**") by the FDIC and the Division.

The FDIC and the Division considered the matter and

determined to accept the STIPULATION.

Having also determined that the requirements for issuance

of an order under 12 U.S.C. §§1818(b) and 38 Ill. Adm. Code §

392 et seq., have been satisfied, the FDIC and Division HEREBY

ORDER that the Bank, its institution-affiliated parties, as that

term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u),

and its successors and assigns, take affirmative action as

follows:

<u>BOARD PARTICIPATION</u>

1.   (a)  As of the effective date of this ORDER, the board

of directors shall increase its participation in the affairs of

the Bank, assuming full responsibility for the approval of sound

policies and objectives and for the supervision of all of the

Bank's activities, consistent with the role and expertise

commonly expected for directors of Banks of comparable size.

This participation shall include meetings to be held no less

frequently than monthly at which, at a minimum, the following

areas shall be reviewed and approved: reports of income and expenses; new, overdue, renewal, insider, charged off, and recovered loans; investment activity; adoption or modification of operating policies; individual committee reports; audit reports; internal control reviews including managements responses; reconciliation of general ledger accounts; and compliance with this ORDER.  Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

(b)   Within sixty (60) days from the effective date of this ORDER, the Bank's board of directors shall have in place a program that will provide for monitoring of the Bank's compliance with this ORDER.

CAPITAL

2.   (a)   Within one hundred-twenty (120) days from the effective date of this ORDER, the Bank shall have and maintain its level of Tier 1 capital as a percentage of its total assets (**"capital ratio"**) at a minimum of nine (9%) percent and its level of qualifying total capital as a percentage of risk-weighted assets (**"total risk based capital ratio"**) at a minimum of thirteen (13%) percent.  For purposes of this ORDER, Tier 1 capital, qualifying total capital, total assets, and risk-weighted assets shall be calculated in accordance with Part 325 of the FDIC Rules and Regulations (**"Part 325"**), 12 C.F.R. Part

3

325.

(b)    If, while this ORDER is in effect, the Bank
increases capital by the sale of new securities, the board of
directors of the Bank shall adopt and implement a plan for the
sale of such additional securities, including the voting of any
shares owned or proxies held by or controlled by them in favor
of said plan.  Should the implementation of the plan involve
public distribution of Bank securities, including a distribution
limited only to the Bank's existing shareholders, the Bank shall
prepare detailed offering materials fully describing the
securities being offered, including an accurate description of
the financial condition of the Bank and the circumstances giving
rise to the offering, and other material disclosures necessary
to comply with Federal securities laws.  Prior to the
implementation of the plan and, in any event, not less than
twenty (20) days prior to the dissemination of such materials,
the materials used in the sale of the securities shall be
submitted to the FDIC Registration and Disclosure Section, 550
17th Street, N.W., Washington, D.C. 20429 and to Scott D.
Clarke, Assistant Director, Illinois Department of Financial and
Professional Regulation, Division of Banking, 122 S. Michigan
Avenue, Suite 1900, Chicago, Illinois 60603, for their review.
Any changes requested to be made in the materials by the FDIC or
the Division shall be made prior to their dissemination.

4

(c)    In complying with the provisions of this
paragraph, the Bank shall provide to any subscriber and/or
purchaser of Bank securities written notice of any planned or
existing development or other changes which are materially
different from the information reflected in any offering
materials used in connection with the sale of Bank securities.
The written notice required by this paragraph shall be furnished
within ten (10) calendar days of the date any material
development or change was planned or occurred, whichever is
earlier, and shall be furnished to every purchaser and/or
subscriber of the Bank's original offering materials.

### PROHIBITION OF ADDITIONAL LOANS TO CLASSIFIED BORROWERS

3.    (a)    As of the effective date of this ORDER, the Bank
shall not extend, directly or indirectly, any additional credit
to, or for the benefit of, any borrower who is already obligated
in any manner to the Bank on any extensions of credit (including
any portion thereof) that has been charged off the books of the
Bank or classified "Loss" in the FDIC Report of Examination
dated September 8, 2009 ("ROE"), so long as such credit remains
uncollected, unless the Bank's board of directors has adopted,
prior to such extension of credit, a detailed written statement
giving the reasons why such extension of credit is in the best
interests of the Bank.    A copy of said statement shall be signed
by each director and incorporated in the minutes of the

applicable board of directors meeting and a copy placed in the appropriate loan file.

(b) As of the effective date of this ORDER, the Bank shall not extend, directly or indirectly, any additional credit to, or for the benefit of, any borrower whose loan or other credit has been classified "Substandard", "Doubtful", or is listed for Special Mention in the ROE, and is uncollected, unless the Bank's board of directors has adopted, prior to such extension of credit, a detailed written statement giving the reasons why such extension of credit is in the best interest of the Bank. A copy of said statement shall be signed by each Director, and incorporated in the minutes of the applicable board of directors' meeting and a copy placed in the appropriate loan file.

<u>REDUCTION OF DELINQUENCIES AND CLASSIFIED ASSETS</u>

4. (a) Within sixty (60) days from the effective date of this ORDER, the Bank shall adopt, implement, and adhere to, a written plan to reduce the Bank's risk position in each asset in excess of $500,000 which is more than ninety (90) days delinquent or classified "Substandard" or "Doubtful" in the ROE. The plan shall include, but not be limited to, provisions which:

(i) Prohibit an extension of credit for the payment of interest, unless the Board provides, in writing, a detailed explanation

6

of why the extension is in the best interest

of the Bank;

(ii)    Provide for review of the current financial

condition of each delinquent or classified

borrower, including a review of borrower

cash flow and collateral value;

(iii)   Delineate areas of responsibility for loan

officers;

(iv)    Establish dollar levels to which the Bank

shall reduce delinquencies and classified

assets within six (6) and twelve (12) months

from the effective date of this ORDER; and

(v)     Provide for the submission of monthly

written progress reports to the Bank's board

of directors for review and notation in

minutes of the meetings of the board of

directors.

(b)   As used in this paragraph, "reduce" means to: (1)

collect; (2) charge off; (3) sell; or (4) improve the quality of

such assets so as to warrant removal of any adverse

classification by the FDIC and the Division.

(c)   A copy of the plan required by this paragraph

shall be submitted to the Regional Director of the FDIC's

Chicago Regional Officer (**"Regional Director"**) and to the

Division.

(d)   While this ORDER remains in effect, the plan
shall be revised to include assets which become more than ninety
(90) days delinquent after the effective date of this ORDER or
are adversely classified at any subsequent examination or
visitation.

LIQUIDITY PLAN

5.   (a)   Within sixty (60) days of the effective date of
this ORDER, the Bank shall adopt a written contingency funding
plan ("**Liquidity Plan**").   The Liquidity Plan shall identify
sources of liquid assets to meet the Bank's contingency funding
needs over time horizons of one month, two months, and three
months.   At a minimum, the Liquidity Plan shall be prepared in
conformance with the Liquidity Risk Management Guidance found at
FIL-84-2008 and include provisions to address the liquidity
issues identified in the ROE.   In addition, the Liquidity Plan
shall require Bank to establish and/or maintain an account
relationship with the Federal Reserve Bank of Chicago to
exchange and settle payment transactions through a clearing
account balance.

(b)   On each Friday the Bank is open for business, or
on a schedule determined by the FDIC and the Division, during
the life of this ORDER the Bank shall submit to the Regional
Director and the Division a liquidity analysis report, in a

8

format that is acceptable to the Regional Director and the
Division.

(c)  The plans and budgets required by this paragraph
shall be submitted to the Regional Director and the Division.

<u>DIVIDEND RESTRICTION</u>

6.  As of the effective date of this ORDER, the Bank shall
not declare or pay any dividend without the prior written
consent of the Regional Director and the Division.

<u>ALLOWANCE FOR LOANS AND LEASE LOSSES</u>

7.  (a)  After the effective date of this ORDER, and prior
to the submission of all Reports of Condition and Income
required by the FDIC, the board of directors of the Bank shall
review the adequacy of the Bank's Allowance for Loan and Lease
Losses ("ALLL"), provide for an adequate ALLL, and accurately
report the same. The minutes of the board meeting at which such
review is undertaken shall indicate the findings of the review,
the amount of increase in the ALLL recommended, if any, and the
basis for determination of the amount of ALLL provided.  In
making these determinations, the board of directors shall
consider the FFIEC Instructions for the Reports of Condition and
Income and any analysis of the Bank's ALLL provided by the FDIC
or the Division.

(b)  ALLL entries required by this paragraph shall be
made prior to any capital determinations required by this ORDER.

9

PROFIT PLAN AND BUDGET

8.    (a)   Within sixty (60) days from the effective date of
this ORDER, the Bank shall prepare a written profit plan and a
realistic, comprehensive budget for all categories of income and
expense for calendar years 2010 and 2011.  The plans required by
this paragraph shall contain formal goals and strategies,
consistent with sound banking practices, to reduce discretionary
expenses and to improve the Bank's overall earnings, and shall
contain a description of the operating assumptions that form the
basis for major projected income and expense components.

(b)   The written profit plan shall address, at a
minimum:

   (i)    Realistic and comprehensive budgets;

   (ii)   A budget review process to monitor the
     income and expenses of the Bank to compare
     actual figures with budgetary projections;

   (iii) Identification of major areas in, and means
     by which, earnings will be improved; and

   (iv)   A description of the operating assumptions
     that form the basis for and adequately
     support major projected income and expense
     components.

(c)   During each monthly board meeting following completion
of the profit plans and budgets required by this paragraph, the

10

Bank's board of directors shall evaluate the Bank's actual performance in relation to the plan and budget, record the results of the evaluation, and note any actions taken by the Bank in the minutes of the board of directors' meeting at which such evaluation is undertaken.

(d)   A written profit plan and budget shall be prepared for each calendar year for which this ORDER is in effect.

(e)   The plans and budgets required by this paragraph shall be submitted to the Regional Director and the Division.

<u>CONCENTRATIONS OF CREDIT</u>

9.   (a)   Within sixty (60) days from the effective date of this ORDER, the Bank shall formulate, adopt, and implement a written plan to manage each of the concentrations of credit identified in the ROE in a safe and sound manner.  At a minimum the plan must provide for written procedures for the ongoing measurement and monitoring of the concentrations of credit, and a limit on concentrations commensurate with the Bank's capital position, safe and sound banking practices, and the overall risk profile of the Bank.

(b)   A copy of the plan required by this paragraph shall be submitted to the Regional Director and the Division.

11

## NOTIFICATION TO SHAREHOLDER

10.   Following the effective date of this ORDER, the Bank shall send to its shareholder a copy of this ORDER: (1) in conjunction with the Bank's next shareholder communication; or (2) in conjunction with its notice or proxy statement preceding the Bank's next shareholder meeting.

## PROGRESS REPORTS

11.   Within forty-five (45) days from the end of each calendar quarter following the effective date of this ORDER, the Bank shall furnish to the Regional Director and the Division written progress reports signed by each member of the Bank's board of directors, detailing the actions taken to secure compliance with the ORDER and the results thereof.

The effective date of this ORDER shall be upon issuance by the FDIC and the Division.

The provisions of this ORDER shall be binding upon the Bank, its institution-affiliated parties, and any successors and assigns thereof.

The provisions of this ORDER shall remain effective and enforceable except to the extent that, and until such time as,

any provision has been modified, terminated, suspended, or set
aside by the FDIC and the Division.

Pursuant to delegated authority.

Dated: *May 27, 2010*

_____          _____
M. Anthony Lowe                            Jorge A. Solis
Regional Director                          Director
Chicago Regional Office                    Illinois Department of
Federal Deposit Insurance                  Financial and Professional
Corporation                                Regulation, Division of
                                           Banking

13

## **Exhibit B**
## **Receiver Report on Value**

ORIGINAL

1  CRAIG A. WELIN (State Bar No. 138418)
   cwelin@frandzel.com
2  BRUCE D. POLTROCK (State Bar No. 162448)
   bpoltrock@frandzel.com
3  FRANDZEL ROBINS BLOOM & CSATO, L.C.
   6500 Wilshire Boulevard, 17th Floor
4  Los Angeles, California 90048-4920
   Telephone:   (323) 852-1000
5  Facsimile:   (323) 651-2577
6  Attorneys for Plaintiff, BUILDERS BANK
7

FILED
LOS ANGELES SUPERIOR COURT

OCT 2 7 2008

JOHN A. CLARKE, CLERK

BY N. DE LUNA, DEPUTY

8              SUPERIOR COURT OF CALIFORNIA
9          COUNTY OF LOS ANGELES, CENTRAL DISTRICT
10

11  BUILDERS BANK, an Illinois banking
    corporation,

12                 Plaintiff,
    v.
13
    CARBON BEACH PARTNERS, LLC, a
14  Delaware limited liability company; MARK
    ROSS, individually and as Trustee of the
15  ROSS FAMILY TRUST Under Trust
    Agreement dated November 16, 1999;
16  ALLISON BROWN ROSS, as Trustee of the
    ROSS FAMILY TRUST Under Trust
17  Agreement dated November 16, 1999; and
    DOES 1 through 100, inclusive,
18
                   Defendants.
19

CASE NO.   BC 398 979

**REPORT OF RECEIVER'S ACTIVITIES FROM OCTOBER 2, 2008 THROUGH OCTOBER 24, 2008**

Date:  October 29, 2008
Time:  10:00 a.m.
Dept:  59

20
21
22
23
24
25
26
27
28

# ROBB EVANS & ASSOCIATES LLC
### Receiver of
### Eight Condominium Units
### Villas at Carbon Beach
### City of Malibu, California
11450 Sheldon Street
Sun Valley, California 91352-1121
Telephone No.: (818) 768-8100
Facsimile No.: (818) 768-8802

## REPORT OF RECEIVER'S ACTIVITIES
## OCTOBER 02, 2008 THROUGH OCTOBER 24, 2008

## Introduction and Overview

This report is offered as an overview of the activities of the Receiver from October 02, 2008 through October 24, 2008. This report does not constitute an audit and is intended to provide information for the Court to assess and to review the overall progress and status of the Receivership.

## Appointment of Receiver

On October 2, 2008 the Court appointed Robb Evans as Receiver[1] over eight Condominium Units located at 22065 Pacific Coast Highway in the City of Malibu CA. On October 15, 2008, after unsuccessful efforts to sell the note secured by the property, the Receiver formally took charge of the property in a series of meetings with the lender, the borrower/developer, and the project contractor.

During that series of meetings, the Receiver explained the dominion of the Court over the property and the Receiver's control of all property issues. In addition, during that series of meetings, the lender and the borrower/developer reached tentative agreement on a memorandum of understanding regarding their relationship going forward.

In the same series of meetings the project contractor Mr. Jim Hill, President of JA Hill Corporation, and the bank agreed to work with the Receiver to resolve pre-receivership claims and to work on a proposal to complete the project. Subject to further court approval, the bank has indicated a potential willingness to provide additional funding to complete the project.

---

[1] Reference to the Receiver in this report means the Receiver, the Receiver's Deputies, its staff and its counsel.

The Receiver has met with the lender and the borrower and the project contractor to determine and confirm the amount of pre-receivership claims and liens recorded against the project. The Receiver and the lender continue to review the total amount of the liens and claims, and the scope and cost to complete the project. The Receiver and the lender are in the process of meeting with subcontractor claimants and other claimants, and continue to attempt to reach agreement with them.

## Project Inspection

On October 16, 2008, the Receiver met with Mr. Kyle Cederlind, Project Manager for JA Hill Corporation and Mr. Daniel Ruvalcaba, Executive Vice President and Chief Lending Officer of Builders Bank, to conduct a walk-through inspection of each of the eight units in the property, to discuss the status of the project and to discuss completion and market issues. The Receiver took a photographic inventory of the model and one unfinished unit, and made arrangements to have security at the property starting the following day.

The property consists of land area of 2.6 acres (113,256 square feet) fronting on Pacific Coast Highway in the Carbon Beach area of the City of Malibu CA. The general property appearance is a near-complete construction site with locked perimeter fencing, no landscaping and no front terrace or entrance steps.

The building consists of eight units averaging 3,198 square feet with 3 bedrooms and 3.5 baths each, storage units, elevators and four car garages for each unit; the total building square footage is 43,419 square feet.

One of the eight units, unit number three, is virtually complete with floor and bath tile, carpeting, Viking kitchen appliances, bathroom fixtures, chandeliers, a three entrance elevator and wallpaper. The remaining seven units have kitchen and bathroom cabinets, elevators, but no kitchen or bath counters, floor coverings, bathroom fixtures or appliances.

The completion status of the project is 90% as estimated by the bank. Unit Number Three is 99% finished; the remaining units are estimated to be 80% completed. The approximate completion percentages were verified with the Receiver by the President of Kachay Homes, an independent contractor/advisor retained by the bank.

The Receiver met with the City of Malibu Planning Department on October 21, 2008 regarding the permit/inspection status of the project. Mr. Craig George, Division Manager - Environmental & Building Safety, indicated that the project was up to date with inspections and that the relationship with the contractor was professional. The

inspections had been performed on time and there were no outstanding issues. All reports and data requested by the City of Malibu had been provided on a timely basis.

Mr. George added that there were no projects in the approval pipeline comparable to the subject project with regard to price, location, and amenities.

## Marketing Research and Analysis

Immediately after completing control of the property, the Receiver solicited a Broker Price Opinion of the project from Coldwell Banker & Associates, the local broker listing the units for sale. The real estate agent is a member of the International Presidents Circle and Previews Property Specialist for Coldwell Banker in Malibu and stated that the units had been offered since May 2008 at prices ranging from $3.2 Million to $3.6 Million. The agent added that although prices of real estate in the California and Malibu market areas have softened in recent months, she had received offers on two units at $3 Million and $3.2 Million. The escrows were not completed because of the incomplete status of the units and the uncertainties caused by the mortgage and banking crisis. The agent provided an opinion of value for the units at a price range of $2.8 to 3.2 Million (Total Value of $24 Million) but cautioned that the value could be lower in early 2009 when the remaining units are completed, if market conditions deteriorate from the present levels or if the mortgage and banking crisis worsens.

On October 20 and 22, 2008, the Receiver inspected several Malibu condominium projects, including two units that were listed in the appraisal as comparables. The most direct comparable, in the opinion of the broker, is Unit #19 in the Toscana Project on DeVille Way in the City of Malibu CA.

This condominium complex, completed in 2005, consists of 22 units in the Malibu Civic Center area. The units, especially Unit #19 feature ocean and mountain views, custom upgrades, and Viking Appliances, similar to the subject project at Carbon Beach. Negative features are size (2,700 square feet versus 3,198 square feet), amenities, proximity to the beach and the prestige of Carbon Beach compared with the Malibu Colony and Civic Center area.

The square foot asking price of the comparable unit was $957; which has since been reduced to $810. The original asking price would imply a value of $3.1 Million (unadjusted) for each unit; the lowered asking price per square foot would imply a price of $2.6 Million for each unit. These implied prices do not reflect adjustments for location or amenities (such as elevators) for the subject project. In the opinion of the broker, the project location and amenities would justify a higher average price than the comparable.

The Receiver concluded that the marketing efforts should be suspended until the units are completed. At that time the project can be priced and reintroduced to the market based on market conditions and prevailing prices. The lender and the contractor agree with this conclusion.

## Completion and Disposition Strategy

Based on the estimated completion status, the appraisal value, and the Broker Price Opinion, it appears that the best strategy would be to complete the remaining units; and to market the project as individual retail units to individual retail buyers. As described above the process will include attempting to settle with the pre-receivership claimants, completing the review and validating the costs to complete the project, finishing the project, and marketing and selling the completed units

When the cost to complete fully determined and construction restarts, about three months will be needed to finish the project and prepare it for marketing. Required marketing time is unknown at this time. This recommendation by the Receiver is based on the lender's potential willingness to fund the completion costs of the project and the broker's opinion of value that is near $3.0 Million for each unit.

Respectively submitted,

/s/

Robb Evans & Associates LLC
Receiver

1

## PROOF OF SERVICE

2    I, the undersigned, declare and certify as follows:

3    I am over the age of eighteen years, not a party to the within action and employed in the
County of Los Angeles, State of California. I am employed in the office of FRANDZEL ROBINS

4    BLOOM & CSATO, L.C., members of the Bar of the above-entitled Court, and I made the service
referred to below at their direction. My business address is 6500 Wilshire Boulevard, Seventeenth

5    Floor, Los Angeles, California 90048-4920.

6    On October 27, 2008, I served true copy(ies) of the **REPORT OF RECEIVER'S
ACTIVITIES FROM OCTOBER 2, 2008 THROUGH OCTOBER 24, 2008**, the original(s) of

7    which is(are) affixed hereto, to the party(ies) listed on the attached service list.

8    ☒    **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing
correspondence for mailing with the United States Postal Service. Under that practice, it

9    would be deposited with the United States Postal Service that same day in the ordinary
course of business. Such document(s) were placed in envelopes addressed to the person(s)

10    served hereunder for collection and mailing with postage thereon fully prepaid at Los
Angeles, California, on that same day following ordinary business practices.

11

12    ☒    **BY FACSIMILE:** I caused said document(s) to be transmitted by facsimile. The
telephone number of the sending facsimile machine was (323) 651-2577. The name(s) and
facsimile machine telephone number(s) of the person(s) served are set forth in the service

13    list. The document was transmitted by facsimile transmission, and the sending facsimile
machine properly issued a transmission report confirming that the transmission was

14    complete and without error.

15    ☐    **BY E-MAIL:** At approximately _____, I caused said document(s) to be transmitted by
electronic mail. The name(s) and e-mail addresses of the person(s) served are set forth in

16    the service list. The document was transmitted by electronic transmission and without
error.

17

18    ☐    **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be
served by means of this Court's electronic transmission of the Notice of Electronic Filing
through the Court's transmission facilities, to the parties and/or counsel who are registered

19    CM/ECF Users set forth in the service list obtained from this Court.

20    ☐    **BY EXPRESS MAIL:** I deposited such document(s) in a box or other facility regularly
maintained by the United States Postal Service, in an envelope or package designated by

21    the United States Postal Service with delivery fees paid or provided for, addressed to the
person(s) served hereunder.

22

23    ☐    **BY PERSONAL SERVICE:** I personally delivered such document(s) to the person(s)
served hereunder.

24    I certify under penalty of perjury under the laws of the State of California and the United
States of America that the foregoing is true and correct.

25

26    Executed on October 27, 2008, at Los Angeles, California.

27    _E. Pang_

28    E. PANG

**SERVICE LIST**

Dean G. Rallis, Jr.
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA 90071

Jean Pierre Nogues, Jr.
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, CA 90064

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

539390.1

2

100170-011

## Exhibit C
### Bank's Determination of Value

# PRI Pritchett-Rapf
## realtors

August 20, 2009

Mr. Jeremy Cramer
Builders Bank
1999 Avenue of the Stars, Suite 2045
Los Angeles, CA  90067

Re:  Carbon Beach Condos

Dear Mr. Cramer,

Pursuant to your request, the following will address your various questions regarding the eight condominiums on Carbon Beach and Pacific Coast Highway in Malibu.

You asked us to give our opinion as it related to 4 value scenarios.

Scenario Number 1 -  Interior – as is. Exterior/Common Area – "vanilla"
You defined "vanilla" as a limited clean up of the landscaping and parking areas. We do not recommend this approach and it was pointed out by Mark Luetkehans that it may not be realistic as it relates to the City of Malibu and obtaining certificates of occupancy (CofO's).  He indicated that the city may allow the issuance of CofO's in two phases or when each block of 4 units is completed.  That aside, realizing that each unit may require between $250,000-$300,000 to complete, it is our opinion that the individual "as is" price should be as follows:
Unit 1  $2,500,000
Unit 2  $2,350,000
Unit 3  $2,850,000 with new carpet
Unit 4  $2,500,000
Unit 5  $2,500,000
Unit 7  $2,350,000
Unit 8  $2,500,000
Although probably unrealistic because of the City of Malibu and financing, selling individual units would assume that the developer finish the common areas – parking, gate, fencing on Pacific Coast Highway, and landscaping.
The actual selling prices should be within 5%-10% of the listed prices.

Scenario Number 2 – Interior – better finishes. Exterior/common area – "vanilla".
This approach assumes you are completing the units with higher-end finish materials or better than those of the completed unit #3. We do not recommend this approach in that we feel the materials used in unit #3 are adequate and in fact attractive to a potential buyer.  There is no need to go "over board" and spend unrequired dollars.

23732 malibu road    malibu ca 90265    off 310 456 6771    fx 310 456 5688    prmalibu.com

<u>Scenario Number 3</u> – Interior – full remodel. Exterior – major changes to façade, patio, common area.
This approach, according to Mark Luetkehans would cost between $4.5-$5 million. We do not recommend doing this in that it will elevate the prices to potentially unattainable levels. You have already somewhat marketed the units that way in that the previous potential buyers, we believe, assumed that the project would be completed at a "high end" level and the prices reflected that, $3,400,000 to $4,200,000. Those numbers remain unrealistic.

<u>Scenario number 4</u> – Interior – completed at the level of the existing unit #3. Major changes to the façade, patio, common area.

Our recommendation would be slightly different than that approach. We would advise you to finish the remaining 7 units at the level of unit #3. We do not recommend the "major changes" portion. It was broken down by Mark Luetkehans as follows. These are approximate but realistic estimates, and we endorse the following.

| | |
|---|---|
| $2,000,000 | To finish the 7 units which would include minimal landscaping. New carpet for unit #3. |
| $ 350,000 | For new windows. This has already been contracted or committed to and will make a significant difference in reduction of Pacific Coast Highway noise. |
| $ 150,000 | This was categorized as a "must do" and relates to different areas, but primarily retaining walls. |
| $ 150,000 | For private/individual patios at the rear of the units (optional). |
| $ 100,000 | Gates/privacy on Pacific Coast Highway. |
| $ 150,000-$200,000 | To remove inferior exterior spiral stairs to the roof decks and replace these with interior stairs from the second level. |
| $ 150,000-$200,000 | To remove glass and/or construct walls on the 1st level decks and create privacy walls between units. |
| $ 50,000 | To complete the guest parking area with asphalt, curbs etc. |

$3,100,000-$3,200,000 Total
(less $150,000 if you elect to not do rear private yards.)

It is most important to us to have an overall attractive "curb appeal" and to create as much overall parking as possible. Spending around $3,000,000 as opposed to $5,000,000 is the best way to accomplish that. This obviously keeps the overall "cost basis" down. These units cannot be priced over $3,000,000 in our opinion. The major, unavoidable and obvious reason is highway noise. This can be reduced acoustically with the windows and deck walls, but it will never disappear 100%. Historically, in other locations, the "noise factor" (sound does rise) has made the marketing of Pacific Coast Highway properties more difficult and necessitates more time on the market.

-2-

We would suggest the listing prices of the 8 units under scenario number 4 (modified) be as follows:

Unit 1  $2,995,000
Unit 2  $2,850,000
Unit 3  $2,850,000
Unit 4  $2,995,000
Unit 5  $2,995,000
Unit 6  $2,850,000
Unit 7  $2,850,000
Unit 8  $2,995,000

The actual selling prices should be with 5%-10% of the listed prices.

There are many positives to your project. They are close to "town" or the Westside. The square footage is greater than any other condos in Malibu. The floor plans are well done. The parking/garage/storage areas are exceptional. The access to Carbon Beach (through the "Geffen" easement) is fabulous (within 100'-200 +). You have good ocean views.

You asked us for comparable sales. That is really very difficult. The only other condos somewhat similar are at "The Pointe" near Point Dume, but these don't compare in that they are only 2,000 + sq.ft. and have no ocean views and are not new. These units sell in the $1,100,000-$1,300,000 range. The other basis for keeping the prices under $3,000,000 is that above that number you are competing with condo units on the ocean (Malibu Outrigger/Malibu Road) and the ocean side (of Pacific Coast Highway) condos such as Zuma Bay Villas. The highest sale on any of those locations is $4,500,000 almost two years ago. In general all of the those mentioned three areas are superior to your Carbon Beach/Pacific Coast Highway project. Albeit smaller units in square-footage they are off of Pacific Coast Highway. Your Carbon Beach condos are somewhat in "unchartered" price areas because of the location, large square footage, and "new" construction, but we view that as a positive.

These above value estimates are based on completion within 6-9 months from now. No one has a crystal ball, but we believe that by the spring of 2010 the real estate market will be substantially better.

One major concern in the selling of the units will be financing. As you are quite aware, jumbo loans are very difficult to obtain, even for the well qualified. The appraisers have become overly cautious and conservative. Fortunately we have some excellent contacts in this arena, and this is Malibu and many of our recent transactions have been all cash.

We have enclosed our basic marketing approach and company profile for your review. We have also included a resume of Jack Pritchett, one of the two partners of the firm. We feel there should also be some distinctive marketing for this project. An attractive/professional brochure should be created. A special website needs to be done. The internet is responsible for approximately 80% of our current marketing responses. The obvious exposure areas are the multiple listing service, print/magazine ads, signs, & broker open houses. In addition to that, we would commit to creating a team to hold the units open on a regular basis. Additionally, we have a special, private mailing list that includes attorneys, business managers and celebrity clients. We have represented and will contact many of the owners across Pacific Coast Highway on Carbon Beach such as Eli Broad, David Geffen, Frank McCourt, Haim Saban, Jeffrey Katzenberg, Peter Morton, Michael Lambert, etc. As far as "time on the market" is concerned, we feel it could take around 6-9 months from the date the units are finished. We would however begin pre-marketing immediately with the recommended new realistic asking prices.

We also would recommend that you professionally stage one unit. We can assist you in that area if you desire. The current state of Malibu real estate is one of more available units for sale than any other time in recent years. This necessitates more than ever proper pricing. Overall sales volume is probably off 30%-40%. Prices in Malibu, in a "down" market, do not adjust dramatically downward. Malibu owners, for the most part, have the wherewithal to "weather" a slow market even if it lasts for a prolonged period unless the prices are unrealistic and inflated to begin with.

We appreciate the opportunity to possibly represent you in this project and to give you our thoughts and opinions. We believe we can be an asset to you and look forward to a mutually benefical relationship.

Please contact us if you have any questions.


Jack  Pritchett                    Jim Rapf                    Bill Kelly

-4-

# Pritchett-Rapf
## realtors

# Jack Pritchett

| | | |
|---|---|---|
| **Summary of Qualifications** | 1978 | President, Malibu Board of Realtors |
| | | Finance Committee, and Nominating Committee (Handling Ethics & Arbitration disputes) |
| | 1977 | Vice President, Malibu Board of Realtors |
| | 1976 – 1979 | Malibu Board of Realtors, Board of Directors |
| | May, 1973 | California Real Estate Brokers License |

**Education**

Continuing education classes as required by law for real estate license renewal
Graduated Cum Laude, Bachelor of Arts & Science degree

| | |
|---|---|
| 1969 – 1972 | University of Southern California |
| 1968 – 1969 | University of California, Berkeley |

**Professional Experience**

| | | |
|---|---|---|
| 1994 – Present Partner/Owner | Pritchett-Rapf & Associates | Malibu, California |
| 1973 – 1994 Partner/Owner | Pritchett Realty, Inc | Malibu, California |

**Professional Activities**

Have appeared as an expert court witness on several occasions, generally relating to Real Estate values

Guest speaker at Pepperdine University, Malibu, California

**Professional Memberships**

Malibu/Westside Board of Realtors, Member of C.L.A.W.
Southland Regional Association of Realtors
California Association of Realtors member
National Association of Realtors member
Charter Member of Malibu Kiwanis Club

**Awards Received**

1977 – Third highest salesperson (dollar value) in all of Century 21

**Summary**

Owner/Partner of one of Malibu's largest, most productive companies. Supervising over 75 agents on a full-time basis.   Specializing in all aspects of residential real estate:  vacant land, leases, condominiums, homes.

# Pritchett-Rapf
## realtors

**Partial Client List**

- Alan Alexander
- Kirstie Alley
- Gillian Anderson
- Pamela Anderson
- Rosanna Arquette
- Patricia Arquette
- Barbara Bach
- Kevin Bacon
- Michael "Flea" Balzary
- Kim Basinger
- Warren Beatty
- Walter Becker
- Jim Belushi
- Pat Benatar
- Annette Bening
- Candice Bergen
- Stanley Beyer
- William Peter Blatty
- Jon Bon Jovi
- Brian Bosworth
- Eli Broad
- Matthew Broderick
- Avery Brooks
- Gerald Breslauer
- Charles Bronson
- Mel Brooks
- Brian Brown
- Mark Burnett
- Gary Busey
- Nicolas Cage
- Dean Cain
- Lynda Carter
- Dana Carvey
- Peter Cetera
- Bill Chadwick
- Cher
- Tommy Chong
- Dick Clark
- Marshall Coben
- Chris Columbus
- Francis Ford Coppola
- Pierre Cossette
- Bob Daly
- Tony Danza
- John Davis

- Marvin Davis
- Dom DeLuise
- Robert DeNiro
- Neil Diamond
- Leonardo DiCaprio
- Barry Diller
- Mrs. Walt Disney
- Ned Doheny
- Leslie Ann Downe
- Minnie Driver
- Bob Dylan
- Sam Elliott
- Linda Evans
- Max Factor III
- Don Felder
- Freddy Fields
- Mick Fleetwood
- Harrison Ford
- George Forman
- John Forsythe
- David Foster
- Jody Foster
- Richard Frank
- Kenny G
- Sandy Gallin
- Steve Garvey
- David Geffen
- Mel Gibson
- Whoopie Goldberg
- Barry Gordy
- Kelsey Grammar
- Hugh Grant
- Brian Grazer
- Peter Guber
- Linda Hamilton
- Harry Hamlin
- Marvin Hamlisch
- Tom Hanks
- Daryl Hannah
- Valerie Harper
- Ed Harris
- David Hasselhoff
- Goldie Hawn
- Fred Hayman
- Don Henley

- Natasha Henstridge
- Alan Horn
- Kate Hudson
- Helen Hunt
- Rachel Hunter
- Elizabeth Hurley
- Michael Irby
- Janet Jackson
- Kate Jackson
- Gordon Jenkins
- Page Jenkins
- Norman Jewison
- Keyshawn Johnson
- Donna Karan
- Mario Kassar
- Vincent Kickerillo
- Val Kilmer
- Carole King
- Jack Klugman
- Diane Ladd
- Jack LaLanne
- Michael Lambert
- Alan Landsburg
- Norman Lear
- Jane Leeves
- Eric Lieber
- Rich Little
- Shelly Long
- Courtney Love
- Rob Lowe
- Kyle MacLaughlin
- Amy Madigan
- Madonna
- Leonard Maltin
- Howie Mandel
- Dinah Manhoff
- "Cheech" Marin
- Ali MacGraw
- Michael McCarty
- John C. McGinley
- A.J. McLean
- Billy McNamara
- Viggo Mortensen
- Carrie Anne Moss
- Ed O'Neill

# HOMES&LAND

## MALIBU TO BEVERLY HILLS ®

VOLUME 30 - ISSUE 3

June 2009

HOMES AND LAND/MALIBU TO BEVERLY HILLS

Volume 30 Number 3 June/2009

## FREE MAGAZINES NATIONWIDE 800.277.7800

COVER HOME BY BOB RUBENSTEIN AND SUSAN MONUS, COLDWELL BANKER PREVIEWS INTERNATIONAL – SEE PAGE 69

HOMESANDLAND.COM

# HOMES&LAND

## MALIBU TO BEVERLY HILLS ®

VOLUME 29 – ISSUE 12

March 2009



# Pritchett-Rapf
## It's different here.

Offices in Malibu and Topanga

Malibu: 310.456.6771
Topanga: 310.455.4363



**POINT DUME BLUFF HOME**
Malibu: 3 BR main house with 1 BR + 1 BA guest house, 110 feet of frontage, 3000 sq. ft. Great buy! Huge upside! A must see!
$5,899,000
Matt Rapf 310.456.6771



**BROAD BEACH ROAD**
Malibu Beach: Perfect weekender on prestigious Broad Beach Road with private beach rights to West Sea Level Drive!
$1,599,000
Isabel Miller 310.456.6771



**SPECTACULAR FAMILY HOME**
Malibu: Light and bright spacious architectural, maple floors, stone deck with built in BBQ and sink. Ocean views, 4 bedroom. Steps to private beach.
$2,590,000
Also available for lease @ $7,500/mo
John Cosentino 310.456.6771



**REMODEL OPPORTUNITY**
Malibu: Beautiful estate property overlooking Carbon Beach on approx. 2 very private acres. Opportunity to remodel existing wood & glass, home or create your dream. La Costa beach rights included.
$2,950,000
Jack Pritchett/Jeff Chertow 310.456.6771



**MALIBU'S ULTIMATE RANCH!!**
Malibu: Only 5 minutes from Zuma Beach is 320 acres of Malibu's finest ranch land. 2 homes, lakes, tons of flat and useable. Great ocean views. Potential for 6 vineyard/equestrian estates.
$17,900,000
Kirk Murray/Chris Frost 310.456.5621



**PT. DUME RANCH HOME**
Malibu: Best priced Pt. Dume home with Riviera II beach rights. Completely flat .65 of an acre lot with frontage on Wildlife & Fernhill. Classic Ranch style home with 3 bdrms, 2 baths. Create your private Pt. Dume estate with this property.
$1,370,000
Matthew Ogden 310.456.5621



**FABULOUS CONDO WITH BEACH**
Malibu: Rarely available high ceilings and great floor plan. Private driveway, landscaped garden with fountain. Gorgeous mountain views. Riviera III beach rights at amazing price!
$850,000
John Cosentino 310.456.6771



**STUNNING ARCHITECTURAL**
Malibu: Overlooking Malibu Park, this Ed Niles designed home offers incredible ocean views from Palos Verdes to Catalina to the Channel Islands. 4 bedrooms, 6 baths, private master, pool. HUGE PRICE REDUCTION!
$2,999,000
Gayle Pritchett 310.456.5621



**MASTERPIECE ON THE SAND**
Malibu: Stunning three level masterpiece on Malibu Road. Offering 4 bedrooms, 4.5 baths with multiple oceanfront decks. Open floor plan, gourmet kitchen, private rooftop deck and garden.
$10,995,000
Jeff Chertow/Dan Dillon 310.456.6771



**OCEAN VIEWS**
Malibu: Great location across from the Bluff. Ocean views of Santa Monica Bay. Home is a newer 3 BDR + 2 BA, open floor plan, high ceilings, fireplace with bonus room. Large outdoor deck.
$2,100,000
Kirk Murray/David Carter 310.456.5621



**PRIVATE ESTATE**
Malibu: Completely secluded yet close in 3 acre estate. Approximately 6,000 sq. ft. two story home. Beautifully manicured grounds, tennis court, pool, horse facilities and so much more!
$6,950,000
Brant Didden/Jim Rapf 310.456.5621



**MALIBU PARK LAND**
Malibu: Beautiful lot on Morning View Drive with final Malibu City and Coastal Comm. approvals for approx. 6500 sq. ft. architectural style home designed by David Paul Urmston.
$1,370,000
Shen Schulz 310.456.6771



**2.75 ACRE RETREAT**
Malibu: Recently upgraded with outdoor entertaining area, wine cave & stone guest house. Handcrafted rock walls throughout property. Mature oaks and pines and views! The perfect hideaway!
$1,749,000
Jack Pritchett/Chris Frost/Brant Didden 310.456.5621



**SANTA MONICA PENTHOUSE**
Santa Monica: Extraordinary white water views from the sought after Santa Monica building. Open and light, 2 bedroom + den. Many amenities if you want Santa Monica and you want the best you have found it! Call.
$3,999,000
Vicki Salsberg 310.456.6771



**PARADISE COVE**
Malibu: Owner bought another! Must sell! Best price for a remodeled 3BR + 2BA unit. Hardwood floors, tiled bathrooms, newer kitchen w/granite counters, low space rent.
$575,000
Kirk Murray 310.456.5621



**SELLER FINANCING! TOP ROW!**
Malibu: 2 bedrooms plus loft that can be a perfect 3rd bedroom! Fireplace in living room, vaulted ceilings. Original owner, ideal for a remodel!
$699,900
Allison Ray 310.456.6771



**CARBON BEACH PENTHOUSE**
Malibu: Beautiful, light and bright 2 bedroom condo on the water at Carbon beach! Great building offering controlled access and a pool. Perfectly located in central Malibu.
$1,995,000
Jeff Chertow/Lenny Goldsmith 310.456.6771



**POINT DUME**
Malibu: Lowest price Pt. Dume house with private beach rights! 4bd + 4 bath charming Spanish residence on approx. 1.61 acres. New kitchen w/top of the line appliances. Great open floor plan.
$2,275,000
Jeff Chertow/Matt Rapf 310.456.6771



**PT. DUME CLUB**
Malibu: Fantastic ocean, mountain and sunset views from this well priced move-in condition home. 2 BR + 2BA w/a bonus room, garden, private deck, open floor plan. Low space rent.
$399,000
Kirk Murray 310.456.5621



**REMODELED MFG**
Malibu: Newly remodeled 2+2+office, MFG in Point Dume Club. Features gourmet kitchen w/Viking stove and Bosch dishwasher. Community pool + spa. Walking distance to shops and beach!
$389,000
Shen Schulz 310.456.6771



**MASSIVE PRICE REDUCTION!**
Pacific Palisades: Completely remodeled new kitchen, baths, roof, windows and doors. Large master suite w/ocean view and huge walk-in closet. Lushes landscape on one of blocks largest lots.
$1,795,000
Shen Schulz 310.456.6771



**UPSTAIRS, DOWNSTAIRS**
Malibu: Ocean views from this 3 + 3 Malibu townhouse...clawfoot tubs, travertine shower...complex has pool & clubhouse. It's ready for you. Come hang your hat & kick back.
$795,000
Vicki Salsberg 310.456.6771



**INCREDIBLE FAMILY HOME**
Malibu: 5 Bedroom Mediterranean home in a park-like setting! Mature Oak trees border an amazing pool with a crazy, fun, tunnel slide! Lovely and immaculate!
$1,499,999
Allison Ray 310.456.6771



**PRIVATE OCEAN VIEW ESTATE**
Malibu: Behind gates on a naturally landscaped 1.83 acres is this beautifully appointed approx. 5,000 sq. ft. home w/spacious & open living areas. 4 bedroom suites, each w/their own bath. www.27475windingway.com
Also for lease at $12,000/mo.
$3,650,000
Gayle Pritchett 310.456.5621



**80 ACRE ESTATE PROPERTY**
Agoura: Completely private 80 acre compound entirely surrounded by parkland. Endless views in every direction. Main house, guest house, horse corrals and other out buildings. A must see!
$4,900,000
Chris Frost/Brant Didden 310.456.5621



**LARGE LOT**
Malibu: Nearly flat with Oak trees, utilities, easy access off paved road. Quiet and quaint neighborhood. Very close to PCH and the 101 Fwy.
$195,000
Chris Frost/Brant Didden 310.456.5621

**CHARMING COTTAGE**
Brentwood: In beautiful neighborhood. Beautifully restored 2 + 2. Charming patio, attached guest house & 1 car garage.
$1,650,000
John Cosentino 310.456.6771

**MALIBU ROAD LEASE**
Malibu: Stunning beachfront cottage available for long or short term lease. 2 BR + 2 BA. Perfect for the "Five Star Finicky"!
$20,000/mo
Isabel Miller 310.456.6771

**SUMMER GETAWAY!**
Malibu: This charming condo has all you need for a fabulous sea months in Malibu! Lush grounds, pool and spa! Terms are negotiable!
$3,100/mo
Allison Ray 310.456.6771

**4.5 ACRES ANACAPA VIEW**
Malibu: Whitewater ocean views, sunsets, city lights. See it all from this spectacular property. Huge frontage. All reports available. Priced to sell!
$1,700,000
Chris Frost 310.456.5621

prmalibu.com

prtopanga.com